UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ALFRED R. RHINEHART, JR.,                                        REPORT
                                                                              and
                                        Plaintiff,             RECOMMENDATION
                  v.                                           -----------------------------
                                                                       DECISION
CSX TRANSPORTATION, INC.,                                            and
                                                                         ORDER
                                        Defendant.
_____              10-CV-00086A(F)


APPEARANCES:              LAW OFFICES OF EUGENE C. TENNEY
                          Attorneys for Plaintiff
                          LAURA C. DOOLITTLE, of Counsel
                          5 Niagara Square
                          Buffalo, New York  14202

                          NIXON PEABODY LLP
                          Attorneys for Defendant
                          LAURIE STYKA BLOOM, and
                          SUSAN C. RONEY, of Counsel
                          40 Fountain Plaza
                          Suite 500
                          Buffalo, New York  14202


                              **JURISDICTION**

        This case was referred to the undersigned by Honorable Richard J. Arcara, on

February 9, 2010, for all pretrial matters including preparation of a Report and

Recommendation on dispositive motions.  The matter is presently before the

undersigned on Defendant's motion for summary judgment and to strike the report of

Plaintiff's expert (Doc. No. 92), filed April 15, 2014.

## BACKGROUND

On December 29, 2009, Plaintiff Alfred R. Rhinehart, Jr. ("Plaintiff" or "Rhinehart"), filed the instant Complaint in New York Supreme Court, Erie County, alleging Plaintiff was injured on September 11, 2009, when a train operated by Defendant CSX Transportation, Inc. ("Defendant" or "CSXT") on property owned by Defendant, struck Plaintiff, severing both his legs. On February 3, 2010, CSXT and Norfolk Southern Railway Company ("NS"), [1] removed the action to this court asserting diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

On April 15, 2014, Defendant filed a motion for summary judgment and requesting the court disregard the report of Plaintiff's expert (Doc. No. 92), attaching the Declaration of Laurie Styka Bloom, Esq., in Support of Defendant's Motion for Summary Judgment (Doc. No. 92-1) ("Bloom Declaration"), exhibits A through R (Docs. Nos. 92-2 through 92-19) ("Defendant's Exh(s). __"), Defendant's Statement of Undisputed Facts Pursuant to Local Rule 56 (Doc. No. 92-20) ("Defendant's Statement of Facts"), and Defendant CsX Transportation, Inc.'s Memorandum of Law in Support of Motion for Summary Judgment (Doc. No. 92-21) ("Defendant's Memorandum"). On May 30, 2014, Plaintiff filed Plaintiff's Response to Defendant's Statement of Undisputed Facts and Opposing Statement of Disputed Facts Pursuant to Local Rule 56 (Doc. No. 96) ("Plaintiff's Statement of Facts"), the Declaration of Laura C. Doolittle, Esq. in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 96-1) ("Doolittle Declaration"), exhibits 1 through 10 (Docs. Nos. 96-2 through 96-11) ("Plaintiff's Exh(s). __"), and Plaintiff, Alfred R. Rhinehart Jr.'s, Memorandum of Law in Opposition to

---

[1] Although originally sued as a Defendant to this action as the operator of the train, by Text Order entered April 4, 2011, the parties stipulated to the dismissal of Plaintiff's claims against NS.

Summary Judgment (Doc. No. 96-12) ("Plaintiff's Repsonse").  On June 13, 2014,

Defendant filed Defendant's Response to Plaintiff's Statement of Disputed Facts

Pursuant to Local Rule 56 (Doc. No. 97) ("Defendant's Responding Statement of

Facts"), and the Reply Memorandum in Further Support of Motion for Summary

Judgment (Doc. No. 97-1) ("Defendant's Reply").  Oral argument was deemed

unnecessary.

Based on the following, Defendant's motion is GRANTED in part and DENIED in

part as to the request to strike Plaintiff's expert's report, and should be DENIED as to

summary judgment.


## **FACTS**[2]

Plaintiff Alfred R. Rhinehart, Jr. ("Plaintiff" or "Rhinehart"), along with Jeff

Tedesco ("Tedesco"), and Bob Edgington ("Edgington"), spent much of September 11,

2009, helping a friend, Robert White ("White"), with a construction project – tearing

down a plaster bedroom ceiling and replacing the ceiling with drywall – at White's home

located on Hertel Avenue in Buffalo, New York.  The friends also shared a pizza and a

12-pack of beer, with Plaintiff consuming two or three beers.  Later that evening, Plaintiff

left White's home and proceeded on foot to a bar, Hilliker's ("Hilliker's" or "the bar"),

located on Military Road near its intersection with Amherst Street, in Buffalo.  Plaintiff's

trek took him west on Hertel Avenue, then south on Elmwood Avenue.  Rather than

continuing on Elmwood Avenue through a railroad underpass to Grote Street, Plaintiff

took what he referred to as a "cut-through" or "shortcut" ("the cut-through"), from the

parking lot of the former FWS business on Elmwood Avenue, over train tracks owned by

---

[2] Taken from the pleadings and motion papers filed in this action.

Defendant CSX Transportation, Inc. ("Defendant" or "CSXT"), through a field to Grote Street.  The parcel of land through which the cut-through passes is bordered on the north by Hertel Avenue, on the south by Grote Street, on the east by Elmwood Avenue, and on the west by Military Road.

The tracks over which the cut-through crossed consist of two sets of tracks, geographically running east and west, but referred to, in railroad terms, as north and south.  The track to the north is "Track 1" or "the north track," and the track to the south is "Track 2" or "the south track."  The two tracks are part of what is known as the "Belt Line Subdivision" which joins west of Military Road with the Niagara Branch running geographically north and south, but east and west according to railroad terms.

The cut-through commences through an open swing gate at the FWS parking lot on the west side of Elmwood Avenue over a dirt path through vegetation to the north side of Track 1.  Leading from the south side of Track 2 is another path through vegetation passing through an open hurricane fence (chain link) gate to a paved driveway leading to Grote Street, which runs perpendicular to Elmwood Avenue. Persons using the cut-through would cross over both sets of track to access either Grote Street or Elmwood Avenue.  Plaintiff had often used the cut-through not only to expedite his travel in that area, but also to avoid the Elmwood Avenue railroad underpass where he had once been mugged.

On September 9, 2011, when Plaintiff used the cut-through, coal train V74010 ("the train"), owned and operated by Defendant, was stopped and standing on the north track of the railroad tracks over which Plaintiff had intended to cross.  The train's crew included engineer Steve Bain ("Bain"), and conductor Iziem Williams ("Williams").  The

train, with 125 cars and pulled by two Union Pacific ("UP") locomotives, measured approximately 1 ¼ miles in length,[3] and was stopped in a north/westbound direction, waiting for an Amtrak train traveling on the Niagara Branch to clear the area. The first or "lead locomotive" was UP 7195, while the second or "trailing locomotive" was UP 6940. The lead locomotive's head was stopped, with its locomotive engines idling, at checkpoint 8 ("CP 8"), located in Buffalo, near Xtreme Wheels Indoor Skate Park ("the skate park"), on Hertel Avenue just past the corner of Military Road approximately one mile from, and facing perpendicular to, where Plaintiff was attempting to cross the tracks. While stopped on the north track, the train's coal cars on the south track were blocking that part of the tracks in the path of the cut-through by which Plaintiff intended to cross from Elmwood Avenue to Grote Street.

After waiting several minutes to see if the train would move, Plaintiff decided to climb over the standing train to cross the tracks, climbing up the stairs on the back of one of the cars, intending to walk across the deck, or top of the car, to descend from the train on the other side the tracks. Plaintiff maintains he had previously crossed standing trains in a similar manner a few times. While Plaintiff was on the rail car in the midst of crossing the train, however, the train unexpectedly jerked as it resumed moving, causing Plaintiff to fall from the car. The train resumed motion after the conductor, Williams, received permission from a CSXT dispatcher by radio and the signal indicator at CP 8 turned from red to green. Plaintiff hung on to the car while his body was dragged some distance, but eventually let go. Plaintiff, whose legs had been severed

---

[3] In particular, the train was comprised of two locomotives referred to as the "locomotive consist" which pulled 125 loaded coal cars. Each locomotive measured 90 feet in length and each coal car measured 52 feet in length such that the entire length of the train was 6,680 feet or 1.26 miles. The train's conductor, Williams, stated at his deposition that the train, including both locomotives and the cars, was 6,774 feet long, and weighed 17,769 tons. Williams Deposition Tr. at 61.

by the moving train, lay on the ground beside the tracks for approximately 15 minutes

before he was discovered at 10:36 P.M. by Canadian National Railway ("CN") train 2811

("the CN train"), travelling on Track 2, parallel to Track 1 on which the train Plaintiff had

attempted to cross sat.

City of Buffalo Police including, *inter alia*, Lieutenants Mary E. Hanley ("Lt.

Hanley"), and March ("Lt. March"), and Police Officers Al Monteforte ("Officer

Monteforte"), Maslowski ("Officer Maslowski"), and Kathleen Paul ("Officer Paul"), were

dispatched to the scene of the accident.  Officer Monteforte arrived first, parking his

patrol car in the FWS parking lot before continuing on foot to the accident scene.  Lt.

Hanley also entered the accident scene through the FWS parking lot.  At least one of

Plaintiff's severed legs was found underneath the CN train on the south track, some 600

feet from where Plaintiff was found.  Plaintiff was conscious and alert and reported to

Monteforte and the Rural Metro of Western New York ("Rural Metro") Emergency

Medical Technicians ("EMTs") Richard Abraham ("Abraham"), and Robert A. Lucarelli

("Lucarelli"), that he had been drinking.  Both Abraham and Lucarelli observed the odor

of alcohol on Plaintiff's breath, with Abraham noting in his report that Plaintiff had drank

"in excess."  Rural Metro Report.[4]  The Buffalo Police Report completed by Officer

Monteforte ("Police Report")[5] indicates Plaintiff was trespassing, in violation of New

York Penal Law § 140.10, on the railroad tracks when he was injured, however, Plaintiff

was never criminally charged with the asserted trespassing.  In the CSXT Police

Incident Report ("CSXT Incident Report")[6] completed by CSXT Police Officer Ronald

Hartman ("Hartman"), in connection with the accident, Plaintiff is referred to as a

---

[4] Defendant's Exh. K.
[5] Defendant's Exh. G.
[6] Defendant's Exh. H.

trespasser.  The CN train stopped and remained at the scene until after Plaintiff was

removed by the EMTs and the police investigation ended at 12:30 A.M. on September

12, 2009.

Although both of the train's locomotives were equipped with event recorders, the

information from the lead locomotive's recorder was not downloaded and only a portion

of its video recorder was reviewed and retained.  The trailing locomotive's event

recorder shows that on September 11, 2009, the train came to a complete stop at

21:51:11 hours, and the locomotive brake was released – the first step required for

forward motion of the train – at 22:12:55, or 21 minutes and 44 seconds later.  The train

was also equipped with auditory signals, including a horn and bell with the horn sitting

on top of a locomotive facing both the front and rear of the train.  Williams could not

remember if Bain released the air brake to resume motion before or after sounding the

horn, but maintains the horn was sounded.  Bain testified at his deposition that he

sounded the horn for longer than is required per CSXT's own regulations because of the

vicinity of the skate park to the train.  Shortly after resuming motion, the train arrived at

its final destination at Wonalancet at the Kenmore train yard, where Williams and Bain

learned that an injured man had been found along the tracks and had possibly been hit

by the coal train operated by Williams and Bain.  Rather than leaving the coal cars at

Wonalancet and bringing the locomotives to the Buffalo yard, located east of Buffalo,

Williams and Bain were instructed to leave the locomotives at Wonalancet for ease in

downloading data from the recorders.

Although Plaintiff survived, his right leg was amputated above the knee and his left leg was amputated below the knee. Plaintiff now relies on a wheelchair and prosthetics.

## DISCUSSION

**1.    Striking the Report of Plaintiff's Expert Witness**

Preliminarily, the court considers Defendant's argument that it should disregard the opinions expressed by Plaintiff's railroad operations expert, Jimmy Calvin Scott ("Scott"), in his report ("Scott's Report"),[7] as not worthy of any weight or merit. Defendant's Memorandum at 16-25. Defendant particularly maintains that the "vast majority" of Scott's opinions are not opinions but only a reiteration of Scott's understanding of the facts, *id.* at 16-18; the subject matter on which Scott intends to offer his opinion does not require expert opinion to assist the trier of fact, *id.* at 19-21; some of Scott's opinions are speculative such that their admission would be highly prejudicial, *id.* at 21-22; some of Scott's opinions are based on inaccurate information, *id.* at 22-24; and Scott's methodologies and opinions do not satisfy any of the expert opinion factors set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (2005). *Id.* at 24-25. In opposition, Plaintiff asserts Defendant's request is premature and unsupported by evidence in admissible form. Plaintiff's Response at 22-25. In further support, Defendant maintains that Scott's opinion fails to create any triable issue of material fact precluding summary judgment. Defendant's Reply at 9-10.

Although Defendant has not moved to strike Scott's Report, but only requests the court disregard the evidence because it does not comport with accepted criteria for

---

[7] Defendant's Exh. P.

expert opinions, "the Court has an independent responsibility to serve as the gatekeeper for expert testimony and to rely only on competent, admissible evidence in ruling on a motion for summary judgment." *Engineered Arresting Systems Corp. v. M/V Saudi Hofuf*, 46 F.Supp.3d 302, 308 (S.D.N.Y. 2014) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (expert's report is not a talisman against summary judgment, but to be admissible it must help the jury to understand evidence or to determine a fact in issue and the district court functions as the gatekeeper for expert testimony)). Accordingly, the court treats Defendant's request to disregard Plaintiff's expert's report, *i.e.*, Scott's Report, as a motion to strike Scott's Report.

Pursuant to Fed.R.Evid. 702,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702 ("Rule 702").

Under Fed. R. Evid. 104(a) ("Rule 104(a)"), "the proponent of the expert testimony carries the burden to establish that the proffered testimony satisfies the requirements for admissibility under Rule 702." *Dreyer v. Ryder Automotive Carrier Group, Inc.*, 367 F.Supp.2d 43, 425-26 (W.D.N.Y. 2005) (citing *Plourde v. Gladstone*, 190 F.Supp.2d 708, 718-19 (D.Vt. 2002), *aff'd*, 69 Fed.Appx. 485 (2d Cir. 2003) (additional citations omitted)).  Accordingly, it is Plaintiff's burden to establish Scott's qualifications to testify as an expert witness and that Scott's proffered testimony complies with Rule 702's criteria for expert opinions.

The admission of expert testimony is ordinarily committed to the sound discretion of the district court, but the exercise of such discretion is not unlimited. *Andrews v. Metro North Commuter R. Co.*, 882 F.2d 705, 710 (2d Cir. 1989) (citing cases). The framework for determining whether testimony is admissible as an expert opinion is set forth in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1994) ("Daubert"), pursuant to which the district courts are to apply Rule 702 so as "to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) (quoting *Daubert*, 509 U.S. at 589). Since *Daubert*, the Court has clarified that "whether a witness's area of expertise was technical, scientific, or more generally 'experience-based,' Rule 702 required the district court to fulfill the 'gatekeeping' function of 'mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). The list of factors enumerated under *Daubert*, while not a "definitive checklist or test," include "whether a proffered expert opinion has the required indicia of scientific reliability: whether a theory or technique had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation." *Id.* (citing *Daubert*, 509 U.S. at 593-94). "[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions." *Id.* Nevertheless, "'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the

expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'"  *Id.* (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  As such, "'when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.'"  *Id.* at 396-97 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)).  Testimony that does not involve scientific, technical, or specialized matters which the jury is incapable of understanding without the benefit of such testimony, however, is not proper expert testimony.  *Andrews*, 882 F.2d at 708.  Nor may an expert witness testify as to whether policies and guidelines were followed because such determinations are for the jury.  *Highland Capital Management, L.P. v. Schneider*, 551 F.Supp.2d 173, 186 (S.D.N.Y. 2008).  Furthermore, "[a]s a general rule an expert's testimony on issues of law is inadmissible," and "although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts."  *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (citing cases).  The court thus considers each of the disputed items in Scott's Report under this criteria.

Here, Defendants maintains that of the 26 separately denominated "opinions" in Scott's report many, including items 1, 2, 3, 5, 9, 10, 11, 12, 13, 15, 16, 17, 18, 19, 20, 21, and 22 are not opinions but, rather, merely a reiteration of Scott's understanding of the facts,  Defendant's Memorandum at 16, a point which Defendants maintain Scott has conceded.  *Id.*  A review of the transcript of Scott's deposition testimony establishes Scott admits that items 1, 2, 3, 5, 9, 10, 11, 12, 13, 15, 17, 18, 20, 21, and

22, [8] are only statements of fact, rather than opinions.  Because such "opinions"

concern "lay matters" of which "a jury is capable of understanding and deciding without

the expert's help," they are not admissible as expert testimony.  *Andrews*, 882 F.2d at

708  (citing cases).  As such, the court will strike these items and considers whether the

remaining items in dispute, *i.e.*, items 4, 6, 7, 8, 14, 16, 19, 23, 24, 25, and 26, qualify

as expert opinions.

**Item 4**

Item 4 states that at the time of Plaintiff's accident, there was a "well worn path

through vegetation from the FWS parking lot to the track bed" and "[s]outh of the south

track there is a well worn path/driveway that passes through a hurricane fence gate that

is left permanently open with vegetation growing around it."  Scott's Report, Item 4.

Scott testified at his deposition that he is not an expert as to maintenance-of-way

issues,[9] Scott Dep. Tr. at 142, and relied on only photographs of the cut-through in

forming this opinion.  *Id*. at 125-26.  As such, Scott is not qualified to give an opinion as

to the condition of the cut-through in Defendant's right of way.  Moreover, whether the

cut-through consists of a "well worn path through vegetation" is not an issue that no jury

---

[8] Although Defendant maintains Scott concurred at his deposition that Item 16 is merely a reiteration of Scott's understanding of the facts and contains no opinion, Defendant's Memorandum at 16, a review of Scott's deposition testimony fails to support this statement, showing instead that Scott characterizes Item 16 as an opinion.  Scott Dep. Tr. at 188.  Similarly, although Defendant maintains Scott concurred at his deposition that Item 19 is merely a reiteration of Scott's understanding of the facts and contains no opinion, Defendant's Memorandum at 16, a review of Scott's deposition testimony reveals Scott merely states he was lead to believe by Plaintiff's counsel that Monteforte would testify that no horn or bell sounded.  Scott Dep. Tr. at 190-91.

[9] In his report, Scott describes his expertise as "based upon my education, training and more than 40 years of train operation and consulting experience, as to the general manner in which a Class 1 railroad is operated; the job duties and responsibilities of various railroad personnel including, but not necessarily limited to, engineers, conductors, road foreman of engines, and train masters; the manner in which trains are operated upon the tracks; the function of event recorders and video recorders and the manner in which the information contained on them is downloaded; the investigative and reporting steps that are followed following railroad accidents in general; and the manner in which trains are started up from a stopped position and the various conditions that can factor into movement of the train."  Scott's Report at 1.

would be incapable of determining absent the benefit of testimony involving scientific, technical, or specialized matters. *Andrews*, 882 F.2d at 708. Accordingly, Item 4 of Scott's Report is stricken.

**Item 6**

In Item 6, Scott gives his opinion that "no meaningful steps were taken to discourage or prevent the public from using this [cut-through] as a pedestrian cut through." Because Scott has admitted he is not an expert on maintenance of way issues, Item 6 does not qualify as an expert opinion. Moreover, whether Defendant took any meaningful steps to discourage or prevent the public from using the cut-through as a pedestrian path over the tracks does not require testimony involving scientific, technical, or specialized matters. *Andrews*, 882 F.2d at 708. Item 6 is thus stricken.

**Item 7**

In Item 7, Scott opines that Defendant's "implicit acquiescence to the use of the tracks in this area by members of the public," allowed the cut-through "to become a public crossing."[10] Despite Scott's admission that he is not an expert with regard to the maintenance of way issues, the opinion contained in Item 7 does not relate to a maintenance of way issue. Nor has Defendant challenged Scott's credentials as an expert in railroad operations based on Scott's experience working on the railroad and related training. *See* Defendant's Memorandum at 16 ("The sole source of [Scott's] expertise is his experience on the railroad and his railroad related training."). That Scott is a Certified Federal Railroad Administrator ("FRA") engineer, under 49 C.F.R. Part

---

[10] Whether the cut-through qualifies as a "public crossing" is critical to this case because a determination that it was a public crossing would require Defendant to take certain actions to ensure the public's safety as to passing trains. *See* Discussion, *infra*, at 22-25.

240, and an FRA Certified Conductor under 49 C.F.R. Part 242, *see* Scott's Report,

Exh. A (Scott's Resume, Doc. No. 92-17 at 13-15), *see* Scott Dep. Tr. at 85; Scott

Resume at 2, also is not disputed.   Scott explained that his duties under the rubric of

train operations included being responsible for train crew operations, applying federal

train operation laws, and train movement.   Scott's Report at 1; Scott Dep. Tr. at 79-80.

Scott specified that federal laws applicable to train operations include 49 C.F.R. Parts

200 through 299.   *Id.* at 80-81.   Significantly, 49 C.F.R. § 234.3 pertains to railroad

grade crossing safety.[11]   Scott also explained that he regularly attends track school to

keep up with changes in railroad law especially with regard to railroad crossings so that

when inspecting tracks, he is able to identify any railroad crossing defects that need to

be addressed.   Scott Dep. Tr. at 89-90.   Further, certification as a conductor requires

training and testing in the physical characteristics of the railroad's territory.   49 C.F.R.

§§  242.119(l), 242.121(c).   Defendant does not argue that the ability to identify a

crossing is outside the realm of Scott's expertise.[12]   As such, whether the public's

---

[11] A "grade crossing" is defined as "a place where a railroad and a road, or two railroad lines, cross at the same level."  Oxford Dictionaries, available at
http://www.oxforddictionaries.com/us/defintion/american_english/grade-crossing?q=grade=crossing, *last visited* November 4, 2015.  This is consistent with the train's engineer Steven Patrick Bain's testimony that a grade crossing is the place where a railroad crosses a public highway.  Bain Dep. Tr. (Defendant's Exh. F., Doc. No. 92-7) at 10.

[12] Defendant does, however, argue that Scott's characterization of the cut through as a "public crossing" is incorrect as a matter of law, Defendant's Memorandum at 9, 12-14 and nn. 5 & 6; Defendant's Reply at 6-8 and n. 2.  In particular, Defendant construes "public crossing" in accordance with its definition under the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. §§ 21101 *et seq.*, specifically, "[i]f a public authority maintains the roadway on both sides of the crossing, the crossing is considered a public crossing for purposes of this part."  Defendant's Memorandum at 12-13 (citing 49 CF.R. § 222.9).   A plain reading of Scott's Report, however, fails to establish Scott intended to limit the term "public crossing" to the FRSA definition.  Furthermore, Defendant's reliance, Defendant's Memorandum at 13 n. 6, on *Michigan Southern R.R. Co. v. City of Kendallville*, 251 F.3d 1152, 1154 (7th Cir. 2001), for the proposition that FRSA and the regulations promulgated thereunder preempt Scott from redefining "public crossings" and imposing duties to warn is inapposite insofar as in that case, the Seventh Circuit Court of Appeals observed that state laws, regulations or orders "which are more strict than federal regulations when stricter regulation is necessary to address a specifically local problem" are exempted from preemption by the FRSA.  *Id.*  Accordingly, FRSA does not bar Plaintiff's claims under either state or federal law.

continual and unopposed use of the cut-through as a public crossing is properly the subject of Scott's opinion as an expert on railroad operations.  Accordingly, Item 7 is not stricken.

**Item 8**

In Item 8, Scott states that "[a]s a public crossing, CSX has a duty to maintain it in a safe condition for members of the public."  This statement constitutes a legal conclusion on an issue that ultimately is to be decided by the jury and, thus, is not properly considered as an expert opinion.  *Bilzerian*, 926 F.2d at 1294.  As such, Item 8 is stricken.

**Item 14**

Item 14 states that information from the lead locomotive's event recorder was not downloaded or retained which is a violation of federal law.  This statement constitutes a legal conclusion which is not properly considered as an expert opinion.  *Bilzerian*, 926 F.2d at 1294.  As such, Item 14 is stricken.

**Item 16**

Item 16 states that "[d]uring the entire time that the train was stopped, the coal cars on the north track were blocking the public crossing west of the Elmwood Avenue overpass."  This statement is, as to the location of the stopped train, a mere recitation of undisputed facts requiring no testimony involving scientific, technical, or specialized matters, *Andrews*, 882 F.2d at 708, but as to the cut-through being a public crossing, is a factual conclusion for which expert opinion is allowed.  *Merriman v. Baker*, 348 N.Y.S.2d 622, 625 (4th Dep't 1973) ("Whether such acquiescence [by railroad to public's

---

Moreover, courts within the Second Circuit have applied New York tort law to cases involving accidents at public railroad crossings, irrespective of the FRSA.  *See*, *e.g.*, *Bowen*, 363 F.Supp.2d at 375-76.

crossing of tracks] exists and is so long continued as to create a public way by invitation is a question of fact for the jury." (citing *Zambardi v. South Brooklyn Ry. Co.*, 24 N.E.2d 312, 315 (N.Y. 1939))), *reversed on other grounds*, 313 N.E.2d 773 (N.Y. 1974). As such, Item 16 is stricken as to the location of the stopped train, but not as to Scott's characterization of the cut-through as a public crossing.

**Item 19**

In Item 19, Scott state that it is his "understanding that Police Officer Monteforte, who was patrolling the area on the evening in question, may also testify that he did not hear a horn or a bell." This statement as to what Scott understood is mere fact, and no jury would require any scientific, technical, or specialized testimony to understand Monteforte's recollection of whether he heard a horn or bell sound before the train resumed motion. As such, Item 19 is stricken.

**Item 23**

In Item 23, Scott states the CSXT's Operating Rules Manual ("ORM") § 2, Rule 13 ("CSXT § 2, Rule 13"), requires "that the engine bell must be rung when an engine is about to move except after momentary stops in continuous switching movements." Scott further opines that this exception did not apply to the stop of the train on September 11, 2009. *Id.* Item 23's reiteration of CSXT § 2, Rule 13 is a mere recitation of undisputed fact requiring no testimony involving scientific, technical, or specialized matters, *Andrews*, 882 F.2d at 708, and Scott's opinion as to whether Defendant followed such rule is a jury determination and, thus, not the proper subject of an expert opinion. *Schneider*, 551 F.Supp.2d at 186.

**Item 24**

In Item 24, Scott explains that because CSXT's ORM § 2, Rule 14 ("CSXT § 2, Rule 14"), requires "the engine horn be sounded at all places were required by law or to prevent accidents," the train's horn should have been sounded upon resuming operation on September 11, 2009. Item 24, as to CSXT § 2, Rule 14, thus is a reiteration of undisputed fact requiring no testimony involving scientific, technical, or specialized matters, *Andrews*, 882 F.2d at 708, and whether Defendant was required to follow such rule is a jury determination and, thus, not the proper subject of an expert opinion. *Schneider*, 551 F.Supp.2d at 186. Item 24 is stricken.

**Item 25**

In Item 25, Scott expresses his opinion that Defendant violated its own OMR Rules 100-D and 100-G by allowing the train "to sit at an unprotected, un-signaled crossing for approximately 15 minutes without uncoupling the cars, preventing the safe passage of pedestrians such as [Plaintiff]." OMR Rule 100-D provides in pertinent part that "[t]rains or cars must not stand on crossings[13] more than a reasonable time without being uncoupled, in order to permit safe passage of pedestrians and of vehicular traffic . . . .," and OMR Rule 100-G states that "[w]hen practicable, cars or other equipment must not stand or be left either within 100 feet of crossings equipped with automatic grade crossing warning devices. Also, they must not stand or be left within 200 feet of crossings not so equipped." The parties agree that what constitutes a "reasonable time" under OMR Rule 100-D is not defined. Plaintiff's Response at 18-19 (observing that whether Defendant's failure to uncouple the train's cars while it was stopped was in violation of OMR Rule 100-D is a jury question); Defendant's Reply at 5-6 & n. 2 ("there

---

[13] The court notes that OMR Rule 100-D, by its express language, is not limited to "public crossings" let alone as that term is defined under the FRSA.

is no authority to suggest that a 20 minute stop was 'unreasonable'").  Accordingly, Item 25 expresses an opinion of fact within Scott's expertise in railroad operations as to whether the train that struck Plaintiff was stopped for more than a "reasonable time," but as to whether Defendant followed Rule 100-D and 100-G, such determination is for the jury and thus is not the proper subject of an expert opinion.  *Schneider*, 551 F.Supp.2d at 186.  Item 25 is stricken as to whether Defendant followed OMR Rules 100-D and 100-G, but not as to whether the train was stopped for more than a "reasonable time."

**Item 26**

Item 26 essentially is a two paragraph recapitulation of many of the prior items delivered by Scott in his report.  With the exception of Scott's characterization of the cut-through as a "public crossing," Item 26, ¶ 1, sentences 4 and 8, the remaining statements of Item 26 are either statements of undisputed facts requiring no testimony involving scientific, technical, or specialized matters, *Andrews*, 882 F.2d at 708, such as "[w]hen a locomotive is stopped at CP 8, it is facing generally in a northerly direction approximately one (1) mile away from the crossing, rendering the visibility of the crossing by the train crew impossible," Item 26, ¶ 1, sentence 5, or legal conclusions for which expert opinion is not allowed, *Bilzerian*, 926 F.2d at 1294, including, *inter alia*, that Defendant "created a dangerous condition when they left an acknowledged, un-signaled and unprotected, public crossing open and accessible with the knowledge that trains would be stopped in this vicinity, awaiting clearance on the Niagara Branch."  Item 26, ¶ 1, sentence 4.  Item 26 is thus stricken except for Scott's reference to the cut-through as a public crossing.

Accordingly, Defendant's motion to strike Scott's Report is GRANTED in part and DENIED in part.


2.    **Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).  The court is required to construe the evidence in the light most favorable to the non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of*

*Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary

judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit

a reasonable juror to return a verdict in his or her favor on'" an essential element of a

claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec.*

*Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379

(2d Cir. 1992)).  Once a party moving for summary judgment has made a properly

supported showing of the absence of any genuine issue as to all material facts, the

nonmoving party must, to defeat summary judgment, come forward with evidence that

would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes*

*Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).   "[F]actual issues created

solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine'

issues for trial."  *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir.

1996).

Defendant moves for summary judgment arguing that (1) Defendant had no duty

to fence the right of way and the railroad tracks to prevent trespassers, including

Plaintiff, from entering Defendant's property, Defendant's Memorandum at 7-9; (2)

Defendant had no duty to warn Plaintiff, *id.* at 9-14; and (3) Plaintiff's own reckless

conduct was the superseding or sole, proximate cause of his injuries.  *Id.* at 14-15.  In

opposing summary judgment, Plaintiff argues that under the relevant circumstances

CSXT, as landowner of the property where Plaintiff was injured, owed Plaintiff a duty of

care.  Plaintiff's Response at 8-22.  In further support of summary judgment, Defendant

maintains Defendant did not violate any duty owed to Plaintiff, Defendant's Reply at 2-4,

Plaintiff has failed to raise any issue of material fact barring summary judgment, *id.* at 4-

6, the accident did not occur at a public or grade crossing, *id.* at 6-8, and Plaintiff's reckless conduct was the sole proximate cause of the accident. *Id.* at 8-9. A review of the evidence in the record establishes genuine issues of material fact exist as to whether Defendant breached a duty of care to Plaintiff precluding summary judgment.

### A.    Negligence

Under New York law,[14] to prove negligence, a plaintiff must demonstrate (1) the existence of a legal duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff proximately resulting from the defendant's breach of the duty. *Greenberg, Trager, Herbst, LLP v. HSBC Bank USA*, 958 N.E.2d 77, 82 (N.Y. 2011) (citing *Akins v. Glens Falls City School Dist.*, 424 N.E.2d 531, 535 (N.Y. 1981)). Where there is no legal duty, there can be no breach and, therefore, no liability in negligence. *Pulka v. Edelman*, 358 N.E.2d 1019, 1021 (N.Y. 1976). *See McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997) ("'In the absence of a duty, as a matter of law, no liability can ensue.'" (quoting *Gonzalez v. Pius*, 525 N.Y.S.2d 868, 869 (2d Dep't 1988))). A determination of negligence thus begins with consideration of whether a duty was owed. *Sukljian v. Charles Ross & Son Co., Inc.*, 503 N.E.2d 1358, 1362 (N.Y. 1986).

### B.    Duty

"The existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal question for determination by the courts." *Bowen v. National Railroad Passenger Corporation*, 363 F.Supp.2d 370, 374 (N.D.N.Y. 2005) (citing *McCarthy*, 119 F.3d at 156). "Duty is essentially a legal term by which we express our conclusion that there can be liability. It tells us whether the risk to which one person exposes another is

---

[14] The parties do not dispute that New York law applies to this diversity action.

within the protection of the law." *DeAngelis v. Luthern Medical Center*, 449 N.E.2d 406,

407 (N.Y. 1983) (citations omitted). "'[A] railroad owes a duty of reasonable care to

those on or near a railroad track.'" *Bowen*, 363 F.Supp.2d at 374 (quoting *Fuentes v.

Conrail*, 789 F.Supp. 638, 640 (S.D.N.Y. 1992) ("a railroad owes a duty of reasonable

care to those on or near a railroad track, whether trespassers or not")).   Accordingly,

Defendant, as a matter of law, owed a duty toward those on or near its railroad tracks.

The court thus turns its attention to whether Plaintiff's presence on and near the tracks

on September 11, 2009, was within the scope of Defendant's duty.

   C.    **Scope of Duty**

       Although in tort cases foreseeability is often confused with duty, "[f]oreseeability

'is applicable to determine the scope of duty – only after it has been determined that

there is a duty.'" *McCarthy*, 119 F.3d at 156 (quoting *Pulka*, 358 N.E.2d at 1022).

"In fixing the bounds of [a] duty, not only logic and science, but policy plays an important

role." *DeAngelis v. Luthern Medical Center*, 449 N.E.2d 406, 407 (N.Y. 1983) (citations

omitted).   "A line must be drawn between the competing policy considerations of

providing a remedy to everyone who is injured and of extending exposure to tort liability

almost without limit."   *Id*.

> [I]dentifying the scope of an alleged tortfeasor's duty is not something derived or
> discerned from an algebraic formula.  Rather, it coalesces from vectored forces
> including logic, science, weighty competing socioeconomic policies and
> sometimes contractual assumptions of responsibility.  New York courts fix the
> duty point by balancing factors, including the reasonable expectations of parties
> and society generally, the proliferation of claims, the likelihood of unlimited or
> insurer-like liability, disproportionate risk and reparation allocation, and public
> policies affecting the expansion or limitation of new channels of liability.

*Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (citations and
quotation marks omitted).

"While New York no longer frames duty of care in terms of the status of the entrant –
such as in invitee, licensee, or trespasser – the circumstances under which a person
enters another's property is relevant to determining what would be reasonable to
impose upon landowners in terms of safety measures."  *Bowen*, 363 F.Supp.2d at 375
(quoting *Basso v. Miller*, 352 N.E.2d at 868, 872 (N.Y. 1976) ("While status is no longer
determinative, considerations of who plaintiff is and what his purpose is upon the land
are factors which, if known, may be included in arriving at what would be reasonable
care under the circumstances.")).  As such, the law "recognizes a higher duty of care
where the railroad has knowledge of a person's entry and the scope of the duty
expands in relation to the knowledge.  Knowledge need not be actual but may be
imputed through notice of an entrant's presence."  *Id.* (citing *Fuentes*, 789 F.Supp. at
641).  "As one would expect, the scope of the duty owed contracts where a railroad
lacks such knowledge and has a reasonable expectation that persons will not be
present on its right of way."  *Id.*

Although the railroad is entitled to use its right of way, the duty owed to those
who must necessarily enter that right of way, such as to cross the railroad at road and
street or highway crossings, "is articulated in detail in various state and federal
regulations" prescribing "warnings, warning devices, and/or barriers at such crossings."
*Bowen*, 363 F.Supp.2d at 375 (citing 49 C.F.R. § 234).  Despite the fact that railroad
tracks often pass through populated areas, trespassers are not deemed legally
anticipated as inevitable entrants; rather, New York Rail Road Law ("N.Y. R.R. Law") §

83 ("§ 83"),[15] prohibits the presence in the right of way of anyone not associated with

the railroad.  *Id.*  As such,

> prior to *Basso* when status was still the measuring stick of the duty of care, the
> Court of Appeals succinctly summarized the law in this area in *Merriman v. Baker*
> as: "Whoever walks upon, or along, the tracks of a railroad, except when
> necessary to cross the same upon some street, highway, or public place, violates
> the law and is like a trespasser, and the company's servants are under no other
> obligation than to refrain from willfully or recklessly injuring him."

*Id.* (quoting *Merriman*, 313 N.E.2d at 775.

Under such circumstances, the essential duty owed to a trespasser is to announce the

passing of trains to allow the trespasser to exit the railroad's right of way.  *Id.*

Nevertheless, as the Second Circuit observed more than a century ago,

> "If the evidence shows that the public had for a long period of time, customarily
> and constantly, openly and notoriously, crossed a railroad track at a place not a
> public highway, with the knowledge and acquiescence of the company, a license
> or permission by the company to all persons to cross the track at that point may
> be presumed.  * * * Persons availing themselves of such an implied license would
> not be trespassers, and the railroad company would come under a duty in
> respect to such licensees to exercise reasonable care in the movement of its
> trains at points where it was bound to anticipate their presence."

*Erie R. Co. v. Burke*, 214 F. 247, 251 (2d Cir. 1914) (affirming jury verdict for plaintiff
who was injured when he was stuck by a train while attempting to cross railroad tracks
where evidence was presented that the railroad employees were aware the right of way
where the plaintiff attempted to cross was extensively used as a footpath by non-
railroad employees (quoting *Felton v. Aubrey*, 74 F. 350, 360 (6th Cir. 1896))).

Knowledge of the presence of what would otherwise be considered trespassers

thus may trigger a greater duty of care, *i.e.*, sounding a warning, where it becomes

known to the railroad that a private crossing has acquired the "nature of a public

crossing."  *Bowen*, 363 F.Supp.2d at 375 (citing *Hooks v. New York C.R.Co.*, 327 F.2d

---

[15] N.Y. R.R. Law § 83 provides in pertinent part that
No person other than those connected with or employed upon the railroad shall walk upon or
along its track or tracks, except where the same shall be laid across or along streets or highways,
in which case he shall not walk upon the track unless necessary to cross the same.

259, 262 (2d Cir. 1964) (citing cases)). Significantly, "'the acquiescence of the railroad may create a license so as to impose upon the carrier to all persons so crossing a duty to exercise reasonable care." *Carpino v. Baker*, 412 N.Y.S.2d 617, 620 (1st Dep't 1979) (citing *Lamphear v. N.Y.C. & H.R.R. Co.*, 86 N.E. 1115 (N.Y. 1909); and *Swift v. Staten Island R.T.R. Co.*, 25 N.E. 378 (N.Y. 1890)).

In the instant case, Defendant argues, Defendant's Memorandum at 13-14 & n. 5, the record is devoid of any evidence on which a trier of fact could find the cut-through was a "public crossing" as defined under the relevant FRSA regulation, 49 C.F.R. § 222.9, *i.e.*, a roadway that crosses a railroad and is maintained by a public authority, such that Defendant cannot be held liable for failing to comply with any duty imposed under the FRSA. Plaintiff's theory of liability, however, is dependent not on the cut-through being a "public crossing" as defined under 49 C.F.R. § 222.9 but, rather, a "public way" under New York tort law. *See*, *e.g.*, Plaintiff's Response at 12 ("The path in question was a public way and Mr. Rhinehart was using it with defendant's implicit consent.").[16] Here, there is evidence in the record on which a reasonable jury could find the cut through was a public way based on Defendant's knowledge for a period of years of the public's crossing of its tracks at the cut-through over which Plaintiff was attempting to traverse when he fell from the train and was injured on September 11, 2009. *Merriman*, 348 N.Y.S.2d at 625 (citing *Zambardi*, 24 N.E.2d at 315). A reasonable jury could further find that by failing to take any steps to prevent the public's use of the cut-through, Defendant thereby acquiesced in its use such that Plaintiff was

---

[16] As noted, Discussion, *supra*, at 14 n. 12, the FRSA has not preempted New York common law in this action.

not a trespasser but, rather, had a license to use the cut-through, imposing on

Defendant a greater duty of care toward Plaintiff while he was using the cut-through.

In particular, Plaintiff testified that he had used the cut-through "a few times" prior

to his accident and had observed other people taking the same path.  Plaintiff's Dep.

Tr.[17] at 39.  Plaintiff also explained that he preferred to use the cut-through because he

had been mugged at the nearby viaduct on Elmwood Avenue.  *Id.* at 41-42.  White gave

deposition testimony that he was familiar with the cut-through Plaintiff took to cross the

train tracks on September 11, 2009, describing it as "a path in front of FWS, go straight

up, straight over to Gioia [a former manufacturing facility located on Elmwood Avenue]. .

. ."  White Dep. Tr.[18] at 24.  According to White, the cut-through had been there since he

was a kid of twelve or thirteen and White as well as "everybody" used the cut-through to

cross the train tracks as White then lived where the cut-through "comes out" on Grote

Street near Bridgeman Street.  *Id.* at 25.  White stated that people were currently using

the cut-through and that not only did the cut-through shorten the distance between

Elmwood Avenue and Grote Street, but it also allowed pedestrians to avoid the train

viaduct on Elmwood Avenue which White described as "a dangerous place," *id.* at 25-

26, yet admitted that aside from newspaper reports of crime at the viaduct, Plaintiff is

the only person White knew who was actually mugged there.  *Id.* at 45-46.  White used

to walk along and hang out by the tracks, but never climbed over rail equipment.  *Id.* at

26-27.  White understood that being near the railroad tracks was dangerous because a

neighbor had lost part of his foot in an accident involving a train at the tracks.  *Id.* at 28.

White stated that every time he drove by the area, he observed "people coming off

---

[17] Defendant's Exh. A (Doc. No. 92-2); Plaintiff's Exh. 1 (Doc.No. 96-2).
[18] Plaintiff's Exh. 1 (Doc. No. 96-2).

those tracks all the time, constant.  The kids take the tracks to school." *Id.* at 29-30.  In response to a question whether the people White observed on the tracks had permission to be there, White stated, "I have no idea.  I didn't know you needed permission to go up there." *Id.* at 30.  White continued to describe the cut-through area as "an empty place," that was "like a park" when White was a child. *Id.* White further stated that "all you got to do is go sit up there on any given day, and you'll see people all over the place.  They stay [*sic*] from the tracks all the way down by The Market [on Tonawanda Street] there, and you see people all the way up, it probably stops probably right around Elmwood, Delaware." *Id.* Edgington, who was among the group of friends assisting White with his construction project on September 11, 2009, testified at his deposition that he also had used the cut-through over the train tracks between Elmwood Avenue and Military Road, and had even climbed over rail equipment to cross the tracks, but was not aware the tracks were private property and never sought anyone's permission to be on the tracks.  Edgington Dep. Tr.[19] at 15-17.

CSXT Manager and Field Agent Daniel P. Christopher ("Christopher"), testified at his deposition that in responding to Plaintiff's accident on September 11, 2009, Christopher parked his vehicle in the FWS store's parking lot on Elmwood Avenue, and then entered the tracks through the same cut-through used by Plaintiff.  Christopher Dep. Tr.[20] at 36.  Christopher further stated that the emergency responders also accessed the accident scene through the FWS parking lot by way of the cut-through. *Id.* at 42-43.  CSXT Police Special Agent Ronald Hartman ("Hartman"), stated at his deposition that upon responding to the accident, he parked at an Elmwood Avenue

---

[19] Plaintiff's Exh. 2 (Doc. No. 96-3).
[20] Defendant's Exh. C (Doc. No. 92-4).

business and "went up to the tracks" behind the business. Hartman March 30, 2012

Dep. Tr.[21] at 42, 44-45. Hartman recalled receiving complaints from train crews passing

through the area of the cut-through of a naked man sunbathing in the vicinity. *Id*. at 85.

CSXT Road Foreman William C. McAllister ("McAllister"), responded to the accident

riding in a vehicle with trainmaster Terry Moore which they parked at the FWS parking

lot on Elmwood Avenue and then walked to the accident scene. McAllister Dep. Tr.[22]

at 19-21, 37-39. McAllister stated that it was not difficult to access the track from the

FWS parking lot. *Id.*, at 39.

Both Rural Metro paramedics Richard C. Abraham ("Abraham"), and Robert A.

Lucarelli ("Lucarelli"), who responded to the accident reported parking in a gravel

parking lot at an Elmwood Avenue business and accessing the scene of the accident by

way of a path leading from the parking lot behind the building up to the train tracks.

Abraham Dep. Tr.[23] at 35; Lucarelli Dep. Tr.[24] at 17, 32-34. Buffalo Police Officer

Monteforte was aware of the cut-through and used it to access the accident scene.

Monteforte Dep. Tr.[25] at 14. According to Monteforte, although Plaintiff was noted in the

police report prepared with regard to the accident as being a trespasser under N.Y.

Penal Law § 140.10,[26] no charges were filed against Plaintiff because Monteforte did

not believe Plaintiff would survive his injuries. *Id.* at 25-26. Monteforte described the

cut-through as a "well worn path" and was aware that people had for years used the cut-

---

[21] Defendant's Exh. I (Doc. No. 92-10).
[22] Defendant's Exh. O (Doc. No. 92-16).
[23] Defendant's Exh. J (Doc. No. 92-11).
[24] Defendant's Exh. M (Doc. No. 92-14).
[25] Defendant's Exh. D (Doc. No. 92-5).
[26] N.Y. Penal Law § 140.10(g) provides that "[a] person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in a building or upon real property * * * (g) where the property consists of a right-of-way or yard of a railroad or rapid transit railroad which has been designated and conspicuously posted as a no-trespass railroad zone."

through to access Grote Street from Elmwood Avenue and that criminal activity was common in the area of nearby viaduct on Elmwood Avenue.  *Id*. at 44-48. Buffalo Police Officer Steven A. Maslowski ("Officer Maslowski"), who assisted Officer Monteforte with the accident investigation for which Maslowski also prepared the police report, Maslowski Dep. Tr.[27] at 12-16, responded to the accident scene by parking in the FWS parking lot on Elmwood Avenue, and then walking from the parking lot over a path up to the train tracks.  *Id*. at 21-22.  Lt. Hanley reported that she responded to the accident, driving her police vehicle to the FWS parking lot on Elmwood Avenue because that was "one of the easiest ways" to gain access to the accident scene.  Hanley Dep. Tr.[28] at 65. After parking the police vehicle in the FWS parking lot, Lt. Hanley exited the vehicle and then walked to the train tracks.  *Id*. at 66-67.  Lt. Hanley did not have to climb over any gate to access the tracks.  *Id*. at 67.  Lt. Hanley was also aware that criminal suspects used the cut-through and she had been investigated the area of the cut-through on five previous occasions.  Hanley Dep. Tr.[29] at 68-71, 76-77.  According to Lt. Hanley, everyone who responded to the accident accessed the tracks via the same route, *i.e.*, through the FWS parking lot using the same cut-through path Plaintiff took to the tracks. *Id*. at 76.

The record also indicates a question exists as to whether there were "no trespassing" signs posted in the vicinity of the cut-through warning pedestrians that entering Defendant's right of way would be considered trespassing.  *See* Christopher Dep. Tr. at 105 (testifying "no trespassing" signs were posted along the Beltline, but unable to specify the location of the closest sign to Plaintiff's accident); Hartman Sept.

[27] Defendant's Exh. L (Doc. No. 92-13).
[28] Defendant's Exh. R (Doc. No. 92-19).
[29] Defendant's Exh. R (Doc. No. 92-19).

13, 2012 Dep. Tr.[30] at 156 (testifying that upon arriving to investigate Plaintiff's accident,

he did not observe any "no trespassing" signs in the area). Nor were there any secure

gates or fences preventing or at least hindering access to the tracks from the FWS

parking lot; rather, the photographs submitted in support of summary judgment show

only an open swing gate that is not connected to any fencing such that the gate would

not realistically deter pedestrian access to the cut-through and, thus, the tracks. *See*

Christopher Dep. Tr. at 44-45 (describing the swing gate located behind the FWS

building as intended to prevent vehicular traffic on the right-of-way); Plaintiff's Dep. Tr.

at 55-57 (Plaintiff stating the swing gate was completely open on the day of his accident

and that he never had to touch the swing gate to gain access to the cut-through). A

Public Safety Communication Center ("PSCC") Incident Report for the period April 26,

2009 through November 11, 2009 ("PSCC Incident Report"),[31] authenticated by

Hartman at his deposition, Hartman September 13, 2012 Dep. Tr. at 158-59,

establishes more than 50 incidents near the tracks involving trespassers, vandalism,

graffiti, and throwing of stones or shooting at trains, indicating ease of access to the

tracks by persons other than railroad employees. Furthermore, there is evidence in the

record of numerous trespassing incidents at the cut-through, including 18 to 20 with

which Hartman was involved, Hartman Sept. 13, 2012 Dep. Tr. at 148, 153, and

Hartman admitted seeing people walking on the railroad right-of-way. *Id.* at 154.

Significantly, Plaintiff's accident is categorized on the PSCC Incident Report as a

"crossing accident" rather than as a "trespasser" incident. PSCC Incident Report at 1

(underlining added).

---

[30] Plaintiff's Exh. 3 (Doc. No. 96-4).
[31] Plaintiff's Exh. 4 (Doc. No. 96-5).

Accordingly, there is sufficient evidence in the record that Defendant, by permitting the cut-through to be commonly used by the public, acquiesced in the use and by such acquiescence the public had acquired a license to use the cut-through, rendering Plaintiff's presence on the tracks on September 11, 2009 reasonably foreseeable, thereby imposing on Defendant a duty of care toward Plaintiff.  Having established there is an issue of fact as to whether Defendant owed Plaintiff a duty as to the cut-through, the court considers what the possible duties could have been.

### 1.    Duty to warn

Defendant argues it did not breach any duty to warn because "no trespassing" signs had been posted within the vicinity of the incident, but that even in the absence of such signs, Plaintiff admitted he was aware the track was active, a point which was obvious given that a train was on the track at the time of the accident, Defendant's Memorandum at 9-10, that prior to resuming motion, the train's crew sounded the train's horn and rang the bell, *id*. at 10-11, which Plaintiff likely was unable to hear given his distance from the locomotive and his intoxicated state, *id*. at 11, only Defendant's own regulation requires a horn be sounded prior to resuming motion, *id*. at 11, and the relevant federal regulation, 49 C.F.R. § 222.21, requires a horn be sounded only when a train is preparing to occupy a public highway-rail grade crossing, which the cut-through did not qualify as.  *Id*. at 12-13.  In opposition, Plaintiff maintains there is no evidence that any "no trespassing" signs were posted near the cut-through, Plaintiff's Response at 11-12, and Plaintiff does not recall hearing any horn sound prior to the train resuming motion just prior to the accident.  *Id*. at 5; Plaintiff's Dep. Tr. at 61.  Plaintiff also argues

that portion of the recording from the train's locomotives' event recorders that would have recorded whether the horn and bells were sounded prior to the train's resuming motion was not recovered.  Plaintiff's Memorandum at 6-7.  In further support of summary judgment, Defendant asserts that Plaintiff's intoxicated state renders his deposition testimony regarding his inability to recall hearing any horn or bell sound prior to the train's resuming motion insufficient to raise an issue of fact to avoid summary judgment.  Defendant's Reply at 5.

Pursuant to 49 C.F.R. § 222.21(a), the horn located on the lead locomotive is required to be sounded when the locomotive "is approaching a public highway-rail grade crossing."  Here, Iziem Williams ("Williams"), the train's conductor, Williams Dep. Tr.[32] at 10, testified that Bain sounded the train's horn prior to resuming motion on September 11, 2009.  *Id.* at 72-73.  CSXT employee Steven Patrick Bain ("Bain"), who was the engineer of the train, described the controls for sounding the horn and bell as located in front of where Bain sat in the locomotive.  Bain Dep. Tr.[33] at 14-15, 32.  The horn faced the front of the train.  *Id.* at 15.  Bain admitted that as engineer, he was responsible for the train's safe operation, including starting and stopping the train in a safe manner, which included sounding the horn and the bell at all crossings for pedestrians.  *Id.* at 10-11.  Bain recalled sounding the horn and the bell before resuming motion on September 11, 2009, particularly because the head of the train was located near the skate park where Bain observed kids in the parking lot.  *Id.* at 32-33.

Plaintiff's failure to recollect hearing any horn or bell sound prior to the train resuming motion, Plaintiff's Dep. Tr. 61, despite Bain's insistence to the contrary, is

---

[32] Defendant's Exh. N (Doc. No. 92-15).
[33] Defendant's Exh. F (Doc. No. 92-7).

consistent not only with the possibility that Plaintiff was intoxicated at the time of the accident, but also with the fact that, given the train was 1 ¼ miles long, the engines on which the horns and bell were installed would have been approximately one mile away from the portion of the train Plaintiff was attempting to cross when the accident occurred such that any sound from the horns or bell may not have reached Plaintiff. Nevertheless, the possible futility of sounding a horn or bells does not dispense with Defendant's obligation to take other protective measures to prevent injury to persons whose presence on or by the tracks is reasonably anticipated.

In particular, as discussed, Discussion, *supra*, at 30-31, there is a question as to whether "no trespassing" signs were posted in the vicinity of the cut-through warning would-be pedestrians that entering Defendant's right of way would be considered trespassing.  *See* Christopher Dep. Tr. at 105 (affirmatively stating there are "no trespassing" signs posted along the Beltline, but unable to state where the closest no trespassing sign was located relative to Plaintiff's accident); Hartman Sept. 13, 2012 Dep. Tr. at 156 (responding to deposition question asking, "did you observe any no trespassing sings in the vicinity of this incident?" that "I did not see any.").   As such, whether "no trespassing" signs were posted in the vicinity of the accident is an open issue of fact for the jury.

Having determined there are unresolved issues of fact as to whether Defendant fulfilled its duty to warn either by sounding any horns or bells before the train resumed motion, or by posting "no trespassing" signs in the vicinity of the cut-through, the court turns to whether Defendant had a duty to fence the area near the cut-through.

### 2.    Duty to fence

Defendant argues that in the absence of a statutory requirement, it was under no duty to erect any fence or barriers near the cut-through.  Defendant's Memorandum at 7-9.  In opposition to summary judgment, Plaintiff acknowledges that no law requires a railway to fence its entire right-of-way, yet argues that Defendant's failure to erect any fence or barrier to keep the public from the cut-through is evidence of Defendant's implicit acquiescence in the public's use of the cut-through, and Defendant could have installed some fencing to deter persons seeking to use the cut-through.  Plaintiff's Response at 16-18.  In further support of summary judgment, Defendant reiterates its argument that it had no legal duty to fence its tracks to prevent trespassers.  Defendant's Reply at 3-4.  According to Defendant, Plaintiff's assertion that a fence would have posed "an insurmountable obstacle" to crossing the tracks is "ludicrous on its face" given that the stopped "12 foot tall, 8 foot wide. miles long train weighing thousands of tons" was described by Plaintiff as only a "modest" obstacle to crossing the tracks.  *Id.* at 4.

"Absent a statutory requirement, railroad owners do not have a duty to fence their property to prevent trespassing."  *Bowen*, 363 F.Supp.2d at 378 (citing *Munger v. Tonawanda R. Co.*, 4 N.Y. 349 (N.Y. 1850); *McCarthy v. New York, N.H. & H.R. Co.*, 240 F. 602, 605 (2d Cir. 1917)).  Although N.Y. R.R. Law § 52 requires fencing to "prevent cattle, horses, sheep and hogs from going upon" the tracks, this law has been construed to apply only for the protection of animals, and not humans.  *Id.* (citing *Lefler v. Pennsylvania R.R., Inc.*, 118 N.Y.S.2d 389 (N.Y. Sup. 1952)); and *DiCaprio v. New York Central R.R. Co.*, 131 N.E. 746 (N.Y. 1917)).  Nor does New York common law impose any fencing requirement in areas like the one where Plaintiff was injured.  *Id.*

Nevertheless, "statutory provisions may not constitute the maximum measure of care demanded of a railroad company.") *Markar v. New York, N.Y. & H.R. Co.*, 77 F.2d 282, 284 (2d Cir. 1935) (observing an "extrahazardous" railroad crossing may require "a higher degree of protection" than statutorily required, citing cases).

In the instant case, given the evidence that the cut-through was routinely used by numerous people, that Defendant was not statutorily required to fence the railroad's entire right-of-way – which would be cost-prohibitive – begs the question of whether Defendant could have erected a partial fence in the area of the cut-through so as to render the cut-through less efficient and, thus, discourage its use by pedestrians, thereby avoiding the possibility that pedestrians, including Plaintiff, could acquire a license to use the cut-through. Accordingly, there is an issue of fact as to whether Defendant breached a duty to erect a fence or other barrier to deter pedestrians from using the cut-through.

### 3. Defendant's Internal Regulations

In opposing summary judgment, Plaintiff argues that Defendant, by failing to uncouple the train cars at the cut-through while the train was stopped at CP 8, violated CSXT's own operating rule that stopped trains that are standing for more than a reasonable time be uncoupled. Plaintiff's Response at 18-22. Defendant argues in opposition that the operating rules to which Defendant refers are applicable only to public grade crossings. Defendant's Reply at 6-8. According to Defendant, the cut-through does not qualify as a public grade crossing, and there is no authority suggesting that the time the train was stopped on the tracks was "unreasonable." *Id.*

Defendant's own rules, on which Plaintiff relies, require that

> Trains or cars must not stand on crossings more than a reasonable time without being uncoupled, in order to permit safe passage of pedestrians and of vehicular traffic.  * * * When crossings are opened, they must be cleared the distance prescribed by Rule 100-G.  If possible, while awaiting passage of trains on adjacent tracks, a crew member must provide protection at opened crossings until the crossings are closed.

OMR Rule 100-D.

Further,

> When practicable, cars or other equipment must not stand or be left either within 100 feet of crossings equipped with automatic grade crossing warning devices. Also, they must not stand or be left within 200 feet of crossings not so equipped.

OMR Rule 100-G.

Here, Defendant's assertion that no legal authority establishes that the approximately 20 minutes for which the train was stopped on the tracks was sufficiently "unreasonable" as to require that the cars on the portion of the track at the cut-through be uncoupled in accordance with OMR Rule 100-D, Defendant's Reply at 7, establishes the existence of a material issue of fact.  The mere fact that Defendant has a regulation requiring the uncoupling of cars when a train is stopped for an unreasonable amount of time is evidence of Defendant's knowledge that persons may attempt to cross a stopped train and the concomitant need to take precautionary action in accordance with OMR Rule 100-D.  Similarly, whether the cut-through qualifies as a public crossing such that the train should not have been left standing within 200 feet of the cut-through without complying with OMR Rule 100-D, is also a material issue of fact precluding summary judgment.

### D.    Proximate Cause

Defendant argues that even if Plaintiff can establish any breach of duty by Defendant, Plaintiff's own reckless behavior was a superseding and the sole proximate

cause of the accident. Defendant's Memorandum at 14-15. Plaintiff asserts in

opposition that the open and obvious dangerous condition of the cut-through does not

obviate Defendant's obligation to take steps to protect Plaintiff and other foreseeable

persons from the danger posed by the stopped train on the track located in the cut-

through. Plaintiff's Response at 1, 18-21. Accordingly, Plaintiff maintains that issues of

comparative negligence are questions of fact to be resolved by the jury. *Id.* at 22. In

further support of summary judgment, Defendant reiterates that Plaintiff's reckless

conduct was the sole proximate cause of the accident. Plaintiff's Reply at 8-9.

A plain and careful reading of the record indicates a myriad of questions of fact

precluding summary judgment on this point. In particular, although Defendant

repeatedly refers to Plaintiff as being drunk at the time of the accident, *see*, *e.g.*,

Defendant's Memorandum at 15 ("Mr. Rhinehart trespassed on railroad property, in

violation of NY Penal Law § 140 and Railroad Law § 83, while publicly intoxicated, to

get to a bar."), "[Plaintiff] told EMT Richard Abraham that he had been drinking 'a lot'

and alcohol could be smelled on his breath."), the record fails to establish this fact. To

the contrary, a plain and careful reading of the record establishes, at best, an issue of

fact as to whether Plaintiff was, in fact, intoxicated or under the influence of any drugs at

the time of the accident. *See*, *e.g.*, White Dep. Tr. at 20 (estimating Plaintiff had only 2

or three bottles of beer), and 47 (White denying Plaintiff smoked marijuana prior to the

accident, and stating Plaintiff was not one to abuse drugs); Edgington Dep. Tr. at 22

(Edgington testifying the four people working on White's construction project on

September 11, 2009, split a 12-pack of beer, with each drinking between 2 and 4

bottles, although Edgington could not recall specifically how many any of them drank,

and denying that anyone was smoking marijuana or using any other drugs).  According

to White, they started working on the construction project at 1:00 or 2:00 in the

afternoon of September 11, 2009, and the 12-pack of beer was purchased a half hour to

one hour after and was consumed along with a pizza.  White Dep. Tr. at 17.  White

recalled drinking three or four of the beers himself, stating that the 12-pack of beer was

the only alcohol consumed because if they got too intoxicated, they would not have

been able to get any work done on the project.  *Id.* at 18.  Significantly, Defendant

admits that Plaintiff's statement to EMT Abraham regarding having had "a lot" to drink

and Abraham's report that he smelled alcohol on Plaintiff's breath is "evidence of

intoxication," Defendant's Reply at 5, which falls short of an established fact.  Further,

although Abraham described Plaintiff as "very lethargic," Abraham Dep. Tr. at 42, when

pressed, Abraham admitted that Plaintiff's lethargic appearance could have been

related to his severe injury, *id.*, and that Abraham was unable to discern whether the

odor of alcohol was beer, wine or liquor.  *Id.* at 43.  The record does reveal Plaintiff's

blood alcohol content at the time of the accident but, rather, indicates Plaintiff's blood

alcohol level was never determined.  *See*, *e.g.*, Abraham Dep. Tr. at 44 (Abraham

responding, "No," to deposition question, "Do you have any idea of Mr. Rhinehart's

blood alcohol was on the day of this incident?").

Moreover, the question of comparative liability is a factual matter for the jury, not

a matter of law for resolution by the court on summary judgment.  *Yoos v. Better Life*

*Technology, Inc.*, 2012 WL 177867, at * 5 (N.D.N.Y. Jan. 23, 2012) (declining to

consider on motion for summary judgment the defendant's argument regarding the

allocation of comparative liability).  Accordingly, based on this record, summary

judgment must be DENIED as to the issue of whether Plaintiff's own conduct was a superseding and the sole proximate cause of his injuries.

## **CONCLUSION**

Based on the foregoing, Defendant's motion (Doc. No. 92), as to the request to strike Plaintiff's expert's report is GRANTED in part and DENIED in part, and should be DENIED as to summary judgment; the parties should be directed to contact the court to schedule trial.

Respectfully submitted, as to Defendant's motion for summary judgment,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

SO ORDERED, as to Defendant's
motion to strike the report of
Plaintiff's expert.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      November 17, 2015
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>**

*Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      November 17, 2015
            Buffalo, New York

40