UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

ALFRED R. RHINEHART, JR.,

                Plaintiff,

                              10-CV-86(LJV)(LGF)
      v.                         DECISION AND ORDER

CSX TRANSPORTATION, INC.,

                Defendant.

———————————————————

## INTRODUCTION

The plaintiff, Alfred R. Rhinehart, Jr., sued CSX Transportation, Inc. ("CSX"),

after his legs were severed when he was struck by a train while on CSX property.  The

defendant moved for summary judgment and to strike the plaintiff's expert report, and

Magistrate Judge Leslie G. Foschio recommended that the motion for summary

judgment be denied and that the motion to strike the expert report be granted in part

and denied in part.[1]  *See* Docket Item 98.  For the reasons stated below and in the

Report and Recommendation (the "R&R"), this Court DENIES IN PART and GRANTS

IN PART the defendant's motion for summary judgment, and DENIES IN PART and

GRANTS IN PART the defendant's motion to strike the plaintiff's expert report.

## FACTUAL BACKGROUND

The following facts are drawn from the pleadings and motion papers filed in this

action.  On September 11, 2009, Rhinehart was walking to a bar located on Military

_____

[1] On February 9, 2010, this case was referred to Judge Foschio under
28 U.S.C. § 636(b)(1)(B)-(C).

Road near Amherst Street in Buffalo, New York.  Rather than walk out of his way down to Elmwood Avenue, Rhinehart decided to take a "cut-through" over train tracks on land owned and operated by CSX, a transportation company that operates the railroad.  But a coal train operating on CSX property was stopped on the tracks and blocked the path Rhinehart intended to take.  Rhinehart waited several minutes to see whether the train would move; when it did not, he began to climb over the standing train to cross the tracks.  Rhinehart maintains that he previously had done the same on stopped trains when they blocked the cut-through.  He said he did that to shorten his commute and to avoid a nearby underpass where he once had been mugged.

While Rhinehart was climbing over the rail car, the train started to move, jerking forward and causing him to fall.  Rhinehart hung on to the car and his body was dragged some distance before he let go.  Following the accident, Rhinehart told emergency responders that he had been drinking alcohol, and the responders smelled alcohol on Rhinehart's breath.

Because his legs were severed by the moving train, Rhinehart now relies on a wheelchair and prosthetics to get around.

## PROCEDURAL BACKGROUND

Rhinehart commenced this action on December 29, 2009, in New York State Supreme Court (Erie County), the jurisdiction in which he was injured on September 11, 2009.  CSX removed the action to this Court, pursuant to 28 U.S.C. § 1441, on February 3, 2010.  28 U.S.C. § 1332(a)(1).

The case initially was assigned to United States District Judge Richard J. Arcara, who referred it to Magistrate Judge Foschio.  Docket Item 5; *see supra* note 1.  Pretrial

discovery continued until June 19, 2013, when the parties agreed that fact discovery was complete. Docket Item 83. CSX then filed its motion for summary judgment and motion to strike on April 15, 2014. Docket Item 92. On May 30, 2014, Rhinehart responded to the motions, Docket Item 96, and on June 13, 2014, CSX replied, Docket Item 97.

Judge Foschio issued his R&R on November 18, 2015, *see* Docket Item 98, and the case was transferred from Judge Arcara to the undersigned on December 4, 2015, Docket Item 101. CSX submitted its objections to the R&R on January 8, 2016, Docket Item 106; Rhinehart responded on March 8, 2016, Docket Item 109; he amended his response on March 9, 2016, Docket Item 110; and CSX replied on April 11, 2016, Docket Item 113. This Court heard oral argument on the objections to the R&R on April 25, 2016, and reserved decision. Docket Item 115. In May 2016, the parties filed supplemental briefs regarding the preemption issue that was first addressed with any depth in the objections. Docket Items 116-18.

## STANDARDS OF REVIEW

### I.      Review of the Report and Recommendation

When a magistrate judge issues a Report and Recommendation on a dispositive motion, the court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to" and "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); *see* 28 U.S.C. § 636(b)(1).

To the extent that a party appeals a magistrate judge's decision on non-dispositive matters, the district court "may reconsider" the decision only "where it has

been shown that the magistrate judge's order is clearly erroneous or contrary to law."

28 U.S.C. § 636(b)(1)(A); *see* Fed. R. Civ. P. 72(a).

## II.    Motion for Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). The movant—that is, the party seeking summary

judgment—has the initial burden of showing that there is no genuine dispute of material

fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It may satisfy this burden

by relying on evidence in the record, "including depositions, documents, . . . [and]

affidavits," Fed. R. Civ. P. 56(c)(1)(A), or by "point[ing] to an absence of evidence to

support an essential element of the nonmoving party's claim." *Goenaga v. March of*

*Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at

322-23); *see* Fed. R. Civ. P. 56(c)(1)(B). Once the movant has satisfied its initial

burden, "the nonmoving party must come forward with specific facts" showing that there

is a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986) (internal quotation marks omitted).

A genuine dispute of material fact exists "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he court must view the evidence in the

record in the light most favorable to the non-moving party" and must draw "all

reasonable inferences in that party's favor." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239

F.3d 456, 466 (2d Cir. 2001). But "conclusory statements, conjecture, or speculation by

the party resisting the motion will not defeat summary judgment." *Kulak v. City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996).

In a diversity case such as this, the Court applies the substantive law of the state whose law would apply under choice-of-law rules—here, New York State. *See, e.g.*, *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999).[2]

## III.    Admissibility of Expert Opinions

The admissibility of expert testimony is governed by the framework in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1994). In that case, the Supreme Court directed trial courts to apply Fed. R. Evid. 702 so that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589.

Under *Daubert*, courts assess admissibility by determining whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Id.* at 592-93. This analysis includes several factors, such as whether the proposed expert methodology "has been a subject of peer review or publication, the known or potential rate of error, and the degree of acceptance . . . within the relevant scientific community." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145 (1999) (internal quotation marks omitted). If the analysis reveals that "an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)). Finally, an expert "may

---

[2] The parties do not dispute that New York law applies to this action.

not give testimony stating ultimate legal conclusions based on . . . facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

## **DISCUSSION**

### I.  **Summary Judgment**

Rhinehart has brought a negligence claim against CSX.  To prove negligence under New York law, a plaintiff must demonstrate (1) the existence of a legal duty owed by the defendant to the plaintiff; (2) a breach of that duty; and (3) injury to the plaintiff proximately resulting from the defendant's breach of the duty.  *See Greenberg, Trager, Herbst, LLP v. HSBC Bank USA*, 17 N.Y.3d 565, 576, 958 N.E.2d 77, 82 (2011).

In its motion for summary judgment, CSX contended that the complaint should be dismissed as a matter of law because it had no duty to fence or erect barriers around the tracks and did not breach any duty to warn.  Docket Item 92-21 at 5.  CSX also argued that Rhinehart's knowing trespass—onto the property and the train, at night and while inebriated—was "reckless behavior" constituting the sole or superseding proximate cause of his injuries.  *Id.*  In its objections to the R&R, CSX further argued that the Federal Railroad Safety Act of 1970 (the "FRSA") either expressly or impliedly preempts "any common-law duty to implement preventative measures—whether to warn, to erect fencing, or to uncouple cars."  Docket Item 106 at 9-10.  And it also argued that the Interstate Commerce Commission Termination Act (the "ICCTA") "expressly preempts Rhinehart's fencing and uncoupling theories."  *Id.* at 19.

Rhinehart responded by arguing that CSX had breached its duty of reasonable care to protect the public from dangerous conditions existing on its property.  Docket Item 110 at 7-8.  With respect to preemption, Rhinehart asserted that CSX

misapprehends his argument, which is that CSX had a duty to exercise reasonable care that "may be measured by [CSX's] own operating rules such that a violation of [CSX's] internal rules . . . is *some evidence* of negligence." *Id.* at 14, 19 (emphasis added).

### A.    Existence of a Duty of Care

Determining negligence requires first deciding whether the defendant owed a duty to the plaintiff. *Sukljian v. Charles Ross & Son Co.*, 69 N.Y.2d 89, 97, 503 N.E.2d 1358, 1362 (1986); *McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir.1997) (noting that the existence and scope of duty is a legal question for the courts). A railroad, such as CSX, has a duty of reasonable care to those on or near its railroad tracks. *Raspente v. Nat'l R.R. Passenger Corp.*, 111 F.3d 239, 242 (2d Cir. 1997) ("Under New York law, a railroad, like any other landowner, owes a duty to exercise reasonable care under the circumstances to persons on its land." (citing *Basso v. Miller,* 40 N.Y.2d 233, 241, 352 N.E.2d 868, 872 (1976))). In fact, CSX owes a duty toward those on or near its tracks regardless of their status—that is, regardless of whether they are trespassers or invitees welcome on the property. *Fuentes v. Consol. Rail Corp.*, 789 F. Supp. 638, 640 (S.D.N.Y.), *aff'd sub nom. Fuentes v. Consol. Rail*, 978 F.2d 706 (2d Cir. 1992).

Here, CSX clearly owed a duty of reasonable care to all those on or near the tracks on its property, including Rhinehart. *See id.*; *Raspente*, 111 F.3d at 242. Therefore, the question of negligence turns on whether Rhinehart, when he climbed over the train that was stopped on the tracks, fell within the scope of CSX's duty of care, and, if so, whether CSX breached that duty.

### B. Scope of the Duty of Care

The scope of an alleged tortfeasor's duty largely is a product of foreseeability and fairness. *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111,114 (2d Cir. 2000) ("[The scope of duty] coalesces from vectored forces including logic, science, weighty competing socioeconomic policies and sometimes contractual assumptions of responsibility." (quoting *Palka v. Servicemaster Mgmt Svs. Corp.*, 83 N.Y.2d 579, 585, 634 N.E.2d 189, 192 (1994))). Therefore, although New York no longer frames the scope of a landowner's duty in terms of the status of the entrant (e.g., trespasser, invitee, licensee), courts consider the circumstances of entry to determine "what would be reasonable to impose upon landowners in terms of safety measures." *Bowen*, 363 F. Supp. 2d at 375. In making that determination, courts consider "the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk." *Basso*, 40 N.Y.2d at 241. Relevant factors, including "[w]here the injury occurred, the dangerousness of the property or the risk of injury posed by the property[,] . . . must be balanced against the utility of the property and the public interest in the free use of property." *Leiching v. Consolidated Rail Corp.*, 858 F. Supp. 337, 339 (N.D.N.Y. 1994). In addition, a defendant's actual knowledge or notice of an entrant's presence bears on the defendant's scope of duty, which expands or contracts accordingly. *Bowen*, 363 F. Supp. 2d at 375.

For example, trespassers "are not presumed to be inevitable entrants and deemed legally anticipated," but a defendant's actual "knowledge of the presence of trespassers may trigger a greater duty of care." *Id.*; *see, e.g.*, *Erie R. Co. v. Burke*, 214 F. 247, 251 (2d Cir. 1914) (finding that when the evidence shows that members of the

public have crossed an open and notorious train track with the railroad company's knowledge and acquiescence, the railroad had a duty to exercise reasonable care). In such instances, the scope of a railroad's duty can swell—for example, from simply sounding a warning alarm at public crossings to making an emergency stop when the railroad is actually aware of an individual trespasser's presence on the tracks. *Bowen*, 363 F. Supp. 2d at 375. In contrast, the duty "contracts where a railroad lacks such knowledge and has a reasonable expectation that persons will not be present on its right of way." *Id.*

As the R&R concluded, there is sufficient evidence here for a reasonable jury to find that CSX knew about the public's frequent use of the shortcut that Rhinehart took over the tracks. Rhinehart testified that he had used the path as a cut-through before. Docket Item 92-2 at 38-39. CSX's own Manager and Field Agent used the shortcut when he responded to Rhinehart's accident, as did the emergency responders. Docket Item 92-4 at 41-45. At least one Buffalo police officer who investigated the scene was well aware of the cut-through and described it as a "well-worn path" that people had used for years. Docket Item 92-5 at 15, 20, 41. And prior occasions of vandalism, graffiti, and other evidence of trespassing further show that the public's use of the cut-through was no secret. *See* Docket Item 96-5.

Because CSX knew, or should have known, of the common use of the shortcut where Rhinehart was injured, it had a greater duty to exercise reasonable care to those who used it. *See Bowen*, 363 F. Supp. 2d at 375. That duty encompassed more than simply warning of a train's passing so that individuals could remove themselves from

danger.  *See id.* ("[K]nowledge of the presence of trespassers may trigger a greater duty of care.").  But nailing down exactly what this higher duty encompasses is trickier.

Rhinehart does not state the precise scope of the defendant's duty but instead asserts that "[t]he record is devoid of any evidence of measures taken by the defendant to discourage use of the public way . . . or to protect those using it from the type of accident that occurred in this case."  Docket Item 110 at 11 (citation omitted).  In addressing the scope of the duty owed, the R&R therefore carefully "consider[ed] what the possible duties could have been," concluding that such duties of CSX might include duties to warn, to prevent trespassers from using the shortcut, and to comply with its internal operating rules.  Docket Item 98 at 31-36.  The possible "duty to warn" as outlined by the R&R concerns "no trespassing" signs and sounding the train's horn.  *Id.* at 31-33.  Because the purpose of a "no trespassing" sign is to discourage and prevent possible trespassers, and because CSX has internal rules concerning such safety measures as sounding a train's horn, this Court will use two categories—a duty to discourage expected trespassers and duties arising out of CSX's internal operating rules—to consider the scope of CSX's duty to exercise reasonable care to persons on its land.

## C.     Preemption

In addition to CSX's scope of duty, this Court must also consider whether any common-law duty is preempted by federal law, mainly the FRSA.[3]  Although CSX raised

---

[3] CSX also argues that any alleged violation of its uncoupling rules and Rhinehart's fencing theory are preempted by the ICCTA.  But the Second Circuit has agreed with "several circuits that have examined the interplay between ICCTA and FRSA [and] . . . concluded that the federal statutory scheme places principal federal regulatory authority for rail safety with the Federal Railroad Administration ("FRA"), not the [Surface

the issue of preemption only by way of a passing footnote in its summary judgment papers, *see* Docket Item 92-21 at 14 n.6, and that issue was mentioned only briefly (and rejected) in the R&R, *see* Docket Item 98 at 14 n.12, much discussion since has centered on CSX's argument that Rhinehart's claim is preempted by federal law. The WDNY Local Rules allow a party to submit objections to an R&R if objections are supported by a clear basis and legal authority. *See* Local Rule 72. Rule 72 also requires a party submitting objections to certify that it is not raising new issues of fact or law, or, if it is, to explain why it did not raise such issues before the magistrate judge. *See id.* The rule does not preclude the district court from considering such new arguments on objection, however, and in the interest of judicial economy, this Court has considered the parties' preemption arguments.

CSX argues that under the supremacy clause of the United States Constitution, Article VI, cl. 2, the FRSA preempts Rhinehart's claim of negligence. The preemptive effect of the FRSA is addressed in 49 U.S.C. Section 20106. Prior to 2007, the FRSA preempted all state railroad laws, regulations, or orders except when necessary to address a *local* safety or security hazard. 49 U.S.C. § 20106(a). In 2007, Congress amended the FRSA to add an exception for certain causes of action under state law, including causes of action alleging that a party "has failed to comply with its own plan, rule, or standard that it created pursuant to a [federal] regulation or order." 49 U.S.C. §20106(b)(1)(B). In other words, when a party fails to comply with an internal standard

---

Transportation Board ("STB")]. . . . Thus, FRSA provides the appropriate basis for analyzing whether a state law, regulation or order affecting rail safety is pre-empted by federal law." *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 107 (2d Cir. 2009) (citations omitted).

or rule created pursuant to a federal regulation or order, claims for violating those internal regulations are fair game. In contrast, standards that an entity creates for itself "to produce a higher level of safety" than required by federal law are preempted. 75 Fed. Reg. 1180, 1209 (Jan. 8, 2010) ("None of those exceptions [to preemption] covers a plan, rule, or standard that a regulated entity creates for itself in order to produce a higher level of safety than Federal law requires.").

The Second Circuit has not addressed preemption under the 2007 amendment, but the Third Circuit has promulgated a two-step analysis for this issue. *See Zimmerman v. Norfolk S. Corp.*, 706 F.3d 170, 178 (3d Cir. 2013) (granting summary judgment on plaintiff's negligence per se claim because it was preempted).[4] Under *Zimmerman*, courts first should decide whether the defendant allegedly violated either a federal standard of care or an internal rule created pursuant to federal regulation. *Id.* If so, then the plaintiff's claim is not preempted. *Id.* (citing 49 U.S.C. § 20106(b)(1)(A)-(B)). If not, then the court should determine whether a federal regulation covers the plaintiff's claim and therefore preempts it. *Id.* (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993), *superseded on other grounds by statute,* Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110–52, 121 Stat. 266 (2007)).

Consistent with this framework, CSX argues that an internal rule is "created pursuant to a regulation" only when a federal regulation requires the railroad to adopt a

---

[4] Although the Second Circuit has considered Section 20106 after it was amended in 2007, *see, e.g.*, *Island Park*, 559 F.3d at 107, it has not addressed the amended subsection—Section 20106(b)—directly. The Third Circuit's two-step analysis in *Zimmerman* is not inconsistent with the Second Circuit's holdings concerning Section 20106.

certain rule. *See* Docket Item 113 at 4-5 (citing § 20106(b)(1)(B)). CSX argues that it

did not adopt the relevant internal rules *pursuant to* a federal regulation but instead

adopted the rules *voluntarily. Id.* Moreover, CSX argues that several FRSA provisions

cover or substantially subsume the subject matter of Rhinehart's claim, as well as the

internal rules that he claims CSX violated. *See id.* at 2 (arguing that Rhinehart's claim is

impliedly preempted by the FRSA). Therefore, CSX concludes, Rhinehart's claim is

preempted.

Rhinehart does not contend that CSX violated a federal standard of care but

maintains that the company "breached its duty of care by failing to take any steps to

protect members of the public to whom they gave a license to use the crossing" and

failed to comply with three internal rules created pursuant to two federal regulations—49

C.F.R. Sections 217 and 218.[5] Docket Item 110 at 8, 14-16. To the extent that his

claim is based on allegations that CSX failed to comply with its internal rules, Rhinehart

argues that his claim is not preempted because CSX failed to comply with internal rules

passed pursuant to Sections 217 and 218. *Id.* Although the basis of his claim is state

common-law premises liability—not the alleged violation of CSX's internal rules per

se—Rhinehart maintains that CSX's alleged violation of its rules "is *some evidence* of

negligence." *Id.* at 14, 19 (emphasis added).

Under step one of *Zimmerman*, this Court examines whether CSX violated a

federal standard of care or internal rules that were created pursuant to a federal

---

[5] As discussed below, in broad terms, Section 217 requires railroads to establish internal operating rules. In equally sweeping language, Section 218 includes the minimum requirements for railroad operating rules, and it permits railroads to adopt more stringent requirements.

regulation.  As noted above, Rhinehart does not argue that CSX violated a federal standard of care—a point that CSX obviously does not contest.  So the only question with respect to the first step of the *Zimmerman* analysis is whether CSX's internal rules that apply to Rhinehart's claim were created pursuant to a federal regulation or order.

Internal rules adopted pursuant to a federal regulation or order are those that a railroad is required to adopt by federal law.  *See Prentice v. Nat'l R.R. Passenger Corp.*, 2014 WL 3868221, at *10 (N.D. Cal. 2014) ("It is insufficient to allege a violation of Amtrak's own rules without citing to any applicable federal regulation mandating these rules."); *Harris v. Norfolk Southern Ry. Corp.*, 2012 WL 6209164, at *6-9 (S.D.W.V. Dec. 13, 2012), *aff'd in part, rev'd in part on other grounds*, 784 F.3d 954 (4th Cir. 2015). And it generally is clear when internal rules are adopted pursuant to federal regulations because the regulations will unmistakably direct the railroad to adopt rules, plans, or standards of care.  *See, e.g.*, 49 C.F.R. § 214.341 (mandating on-track safety program and listing provisions to be addressed); 49 C.F.R. § 218.99 (requiring railroads to adopt operating rules for shoving movements).  If CSX did not violate a federal standard of care or an internal rule created pursuant to a federal regulation, this Court must continue to step two.

Under step two of the *Zimmerman* analysis, the question is whether federal law expressly or impliedly preempts Rhinehart's common-law negligence claim.  "A regulation covers—and thus preempts—the plaintiff's claim if it 'substantially subsume[s] the subject matter' of that claim."  *Zimmerman*, 706 F.3d at 178 (quoting *Easterwood*, 507 U.S. at 664 (stating that the regulations must do more than "touch upon or relate to that subject matter") (internal quotation marks omitted)).  A court should read the term

"cover" in a restrictive manner because, as the Supreme Court has recognized, the FRSA's preemption provision "displays considerable solicitude for state law." *Easterwood*, 507 U.S. at 665.

### D.      Scope of Duty and Preemption Analysis

As outlined above, this Court will analyze the alleged duties in Rhinehart's claim under two categories—a duty to discourage expected trespassers and duties arising from internal rules.  The Court will examine each category to determine first, the scope of any duties owed by CSX and second, whether claims based on the alleged breach of those duties are preempted by federal law.

### 1.      Duty to Discourage Expected Trespassers

#### a.      *Scope of Duty*

The R&R explored whether the scope of CSX's duty encompassed a duty to discourage expected trespassers either through warnings, such as "no trespassing" signs, or barriers, such as fences.  Docket Item 98 at 31-35.[6]  The R&R found that it did and that there were questions of fact concerning the existence and adequacy of "no trespassing" signs and whether CSX breached a duty to erect a fence or barrier to deter pedestrians from using the shortcut.  *Id.* at 33, 35.  This Court agrees with Judge Foschio on both findings and addresses each in turn.

---

[6] The R&R also explored whether CSX's scope of duty encompassed a duty to warn expected trespassers of train movement by sounding the train's horn.  The Court addresses this duty in the next section because it necessitates analysis of CSX's internal rules.  *See* Docket Item 98 at 31-33.

First, the R&R found that there were questions of fact as to whether "no trespassing" signs were posted in the vicinity of the accident.  *Id.* at 33.  This Court agrees with Judge Foschio that whether or not warning signs were posted near the location of Rhinehart's accident, as well as the adequacy of any such signs, remain unresolved issues of fact for the jury.

As discussed above, there is sufficient evidence here for a reasonable jury to find that CSX knew, or should have known, that the cut-through was frequently used by the public for a number of years.  *See supra* Discussion I.B.  Under CSX's heightened duty to persons using the cut-through, the likelihood and seriousness of injury at the cut-through outweighs the burden of posting and maintaining warning signs.  *See Basso*, 40 N.Y.2d at 241.  Therefore, posting warning signs falls within CSX's scope of duty to Rhinehart.  *See id.*

CSX contends that "no trespassing" signs were, in fact, posted within the vicinity of Rhinehart's accident.  Rhinehart maintains that there is no evidence of any warning signs posted near the shortcut.  Docket Item 98 at 31.  The record contains ambiguous testimony by CSX employees as to whether warning signs were posted near the shortcut at the time of the accident.  *See, e.g.*, Docket Item 96-4 at 61-62 (CSX police officer stating that signs were posted at target areas on CSX property, but also stating that he did not observe any such signs near the area of the accident); Docket Item 92-4 at 106 (CSX manager of field investigations testifying that "no trespassing" signs are posted along the tracks but unable to say where the closest sign was in relation to the

accident).  As such, the proximity and adequacy of warning signs remain issues of material fact.

## ii.    Fences or Barriers

Second, the R&R concluded that "there [was] an issue of fact as to whether [CSX] breached a duty to erect a fence or other barrier to deter pedestrians from using the cut-through."  Docket Item 98 at 35.  CSX argues that the well-settled law in New York demonstrates that there is no statutory requirement for a fence to keep people off railroad tracks.  Docket Item 106 at 30-31.  In fact, CSX asserts that any duty to erect a partial fence would impose an "enormous" burden on railroads.  *Id.*  CSX also argues that the R&R's analysis confuses the import of a fence with the import of its absence: whereas its existence can shed light on an entrant's status as a trespasser, a fence's absence cannot establish liability for negligence.  *Id.* at 32.

This Court agrees with the R&R's conclusion that there is an issue of fact as to whether CSX breached a duty to erect a fence or otherwise to deter pedestrians from using the shortcut.  It is true that New York law does not require railroads to fence in or erect barriers around their tracks, and that absent a statutory mandate or other extraordinary circumstances, railroads have no duty to fence the railroad tracks.  *See Bowen*, 363 F. Supp. 2d at 378 ("Absent a statutory requirement, railroad owners do not have a duty to fence their property to prevent trespassing."); *see also Gil ex. Rel. v. Nat'l R.R. Passenger Corp.*, 2007 WL 2230176 (E.D.N.Y. 2007).[7]  And common sense

[7] CSX argues that the facts here are similar to those in *Wilde v. CSX Transp., Inc.*, 2016 WL 7438839 (W.D.N.Y. Dec. 20, 2016).  In *Wilde*, this Court (Skretny, J.) granted summary judgment in favor of CSX because the plaintiff failed to raise a genuine issue of material fact that CSX had been on notice of trespassers or had breached its duty to maintain its property in a reasonably safe condition.  *Id.* at *4-5.  Here, however, the

precludes the notion that railroads must erect thousands of miles of fence—on both sides of the tracks, no less—to prevent trespassers from crossings anywhere. But the duty alleged here would not require such a nonsensical result; the duty here is one of reasonable care to those using a known shortcut across the tracks and therefore foreseeably on CSX's property at a particular location.

Seen in that light, a jury is entitled to decide whether CSX breached the scope of a specific duty that it owed to expected trespassers. For example, a jury should consider whether CSX could have satisfied that duty, in whole or in part, by erecting some sort of barrier along the railroad tracks in the area of the cut-through. A jury might conclude that the swing gate at the cut-through should have been reinforced by additional fencing; or that the frequent use of the pathway in this case necessitated a few hundred feet of fencing on either side; or that concrete barriers should have been erected to discourage use of a dangerous shortcut. On the other hand, a jury might conclude that such barriers were unnecessary and CSX need not have gone to such lengths—or heights—to satisfy its duty of reasonable care. But that ultimately is for a jury to decide, and so the issue of fencing—or other barriers—remains a material issue of fact sufficient to preclude summary judgment.

---

facts are distinguishable from those in *Wilde*. In *Wilde*, it was undisputed that the relevant area had four posted "no trespassing" signs, railings, and low concrete blocks with red and white reflective signs. *Id.* at *1. Moreover, in *Wilde*, CSX employees denied specific knowledge of trespassers along the path in question. *Id.* Here, in contrast, the evidence supports a reasonable inference that CSX indeed knew that people were using the shortcut. And unlike *Wilde*, it is unclear what, if any, warnings or barriers discouraged using the path that led to Rhinehart's accident.

*b.    Preemption*

CSX argues that the duty to discourage expected trespassers—either through warning signs or barriers—is impliedly preempted by Congress.  This Court disagrees.

"To establish implied preemption, evidence of Congressional intent to displace state authority is required."  *Goodspeed Airport LLC v. East Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 209-10 (2d Cir. 2011) (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)).  "[A] federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, or when state law is in actual conflict with federal law."  *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (internal citation omitted).  The Supreme Court has "found implied conflict pre-emption where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (internal citation and quotation marks omitted).

*i.    "No Trespassing" Signs*

A common-law duty to erect warning signs is not incompatible with federal law and therefore not preempted.  CSX argues that the common-law duty is incompatible with 49 C.F.R. 222.27(d), which requires posting signs only at pedestrian crossings located within designated quiet zones—places where trains cannot sound their horns. Docket Item 106 at 17.  Section 222.27(d) is part of a larger scheme regulating train horns and audible warnings at rail grade (authorized) crossings.  *See generally*, 49 C.F.R. § 222 *et seq.* ("The purpose of this part is to provide safety at public highway-rail

grade crossings by requiring locomotive horn use at public highway-rail grade crossings except in quiet zones . . . .").  CSX has not established as a matter of law that the location of the accident was in a quiet zone, however, and therefore covered by Section 222.  Moreover, Congress's judgment to require railroads to post warning signs in lieu of horns in quiet zones, *see, e.g.*, 49 C.F.R. §§ 222.25, 222.27, does not evidence an intent to "substantially subsume" warning requirements across the board. Nor is this Court convinced that by passing the FRSA, Congress intended to relieve railroads of all responsibility to discourage persons from crossing their tracks at shortcuts known to the railroads.

Indeed, preemption here would lead to the nonsensical conclusion that (1) the federal safety regulations that apply in quiet zones do not apply to frequently used cut-throughs like the one here if they are not in quiet zones, but (2) any safety measures a state might adopt to protect pedestrians at such cut-throughs are preempted.  Stated another way, by establishing federal standards that require warning signs only in quiet zones, Congress did not imply that *no* warning standards can apply outside quiet zones. But that is where CSX's argument ultimately leads.

Because Section 222.27(d) refers narrowly to signs at pedestrian crossings in designated quiet zones and therefore does not "substantially subsume" the common-law duty to erect warning signs elsewhere—i.e., outside a quiet zone—CSX has not demonstrated that Section 222.27(d) preempts Rhinehart's claim of negligence under New York common law.

*ii.     Fences or Barriers*

Similarly, a duty to construct barriers to deter expected trespassers is not incompatible with federal law and therefore is also not preempted.  CSX points to the FRSA and the resulting FRA regulations that govern pedestrian grade crossings, 49 U.S.C. Section 20153(f) and 49 C.F.R. Section 222, to demonstrate that a duty to provide a barrier at the cut-through presents an obstacle to the accomplishment of the full objectives of Congress.  Section 20153 concerns "audible warnings at highway-rail grade crossings" and allows the Secretary of Transportation to subject: "1) Private highway-rail grade crossings; 2) Pedestrian crossings; [and] 3) Crossings utilized primarily by nonmotorized vehicles and other special vehicles" to the regulations required under the section.  49 U.S.C. § 20153(f).  Further, the "[r]egulations issued under [49 U.S.C. § 20153(f)] shall not apply to any location where persons are not authorized to cross the railroad."  *Id.*

CSX argues that Section 20153(f) "reflects a congressional determination that railroads should not be required to issue warnings (or take other preventative measures) at unauthorized crossings" and that the imposition of such requirements under the state law is exactly the sort of obstacle to nationally uniform standards that Congress sought to preempt.  Docket Item 106 at 19.  But CSX's argument goes too far.  The regulation of authorized crossings does not evidence an intent to preempt safety measures anywhere along the tracks and does not preclude a duty to prevent or discourage crossing other than where it is authorized.  Again, CSX's argument leads to the nonsensical conclusion that (1) the federal safety regulations that apply at authorized crossings do not apply to frequently used cut-throughs like the one here

because they are not authorized crossings, but (2) any safety measures a state might adopt to protect pedestrians at such cut-throughs are preempted. By establishing federal standards that apply only at authorized crossings, Congress did not imply that *no* standards apply at known but unauthorized crossings.

Moreover, contrary to CSX's argument, *see* Docket Item 106 at 18, a common-law duty concerning shortcuts known to a railroad company does not open the floodgates to myriad *ad hoc* duties for the defendant. As established above, New York law contemplates a greater duty of care when a defendant has knowledge of inevitable trespassers—here, the long-time use of a well-known and established cut-through. *See Bowen*, 363 F. Supp. 2d at 375. Therefore, the scope of duty will not be the same everywhere on the tracks and will not reach every place someone might try to cross the approximately 140,000 miles of railroad tracks across the country. *See Freight Rail Overview*, FRA, https:www.fra.dot.gov/Page/P0362 (last visited Aug. 14, 2017).

CSX also argues that the ICCTA preempts a duty to "fence off the path . . . because such a requirement would have the effect of unreasonably burdening or interfering with rail transportation." Docket Item 106 at 23 (citations and quotations omitted). CSX argues the number of crossings implicated would be prohibitively expensive and burdensome. *Id.* But for the same reasons just discussed, this Court does not find that argument persuasive.

Here, there is an established, heightened common-law duty that is not incompatible with federal regulations. The FRSA sections that CSX argues preempt its duty regulate sounding horns and other safety measures at public highway-rail grade crossings. Although such sections have been found (and, below, will be found by this

Court) to preempt state laws concerning the movement of trains through crossings and regarding when a train's horn must sound, *see, e.g.*, *United Transp. Union v. Foster*, 205 F.3d 851, 861 (5th Cir. 2000), they do not "substantially subsume" the common-law protections here.

Because a common-law duty to discourage expected trespassers is not preempted by federal law and issues of material fact remain, Rhinehart's claim as to warning signs, fences, or barriers survives summary judgment.

### 2. Duties Arising from Internal Rules—Sounding Audible Warnings and Uncoupling Train Cars

#### a. Scope of Duty

The R&R considered whether the railroad's alleged non-compliance with its own operating rules expanded the scope of its duty and therefore established issues of material fact precluding summary judgment. Docket Item 98 at 35-36. The internal operating rules at issue are the requirements: (1) to sound the train's horn before beginning to move, (2) to uncouple the train cars when standing on a crossing for more than a reasonable period of time, and (3) not to stand within 200 feet of a crossing that is unequipped with automatic grade crossing warnings. *See* Docket Item 110 at 14-15; CSX Operating Rules Manual, Rules 13, 14, 100-D, 100-G. The R&R found that "[CSX's] assertion that no legal authority" required it to uncouple its train cars "establishes the existence of a material issue of fact," Docket Item 98 at 36, and that the uncoupling regulation provided evidence of the defendant's "concomitant need to take precautionary action." *Id.* But because CSX did not adopt these rules pursuant to federal law, and because liability arising from these rules is substantially subsumed by

federal regulations, CSX's common-law duties arising from them are preempted, regardless of the scope of such duties.

Before undertaking the *Zimmerman* analysis, it is worth exploring the distinction that Rhinehart seeks to draw between making a claim *based on* the alleged violation of internal regulations and a claim *evidenced by* violations of those internal regulations. Specifically, Rhinehart makes much of the fact that his claim is not based directly on CSX's alleged violations of its internal rules. Rather, he argues that because CSX's violation of its rules is only *some evidence* of negligence, preemption does not apply. He explains:

> Plaintiff is simply alleging a duty by CSXT to exercise reasonable care to those individuals reasonably to be foreseen to be upon its property and that reasonable care under the circumstances may be measured by CSXT's own operating rules such that a violation of CSXT's internal rules regarding the blocking of crossings is some evidence of negligence.

Docket Item 110 at 19.

But that distinction makes no difference. The Supreme Court has recognized that state common-law claims can be preempted by the FRSA. *See Easterwood*, 507 U.S. at 675 (finding state common-law claim of excessive speed preempted by federal regulations on speed). As a result, when a plaintiff argues that the defendant's alleged violation of its internal regulations is simply some evidence of negligence in a common-law liability claim, a claim based on that evidence still can be preempted by federal law. *See, e.g.*, *Michael v. Norfolk S. Ry. Co.*, 74 F.3d 271, 273 (11th Cir. 1996) ("Violation of the railroad's own speed regulations may be evidence of negligence in a state tort claim for excessive speed; however, such a state tort claim is preempted by federal law, and the internal railroad regulations would be irrelevant under federal law.").

So while "the violation of internal rules . . . may be regarded by the trier of the fact as some evidence of negligence," *In re City of New York*, 475 F. Supp. 2d 235, 241 (E.D.N.Y. 2007) (internal quotation mark omitted), and while "noncompliance with internal standards could be evidence of a failure to exercise due care," *De Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1311 (2d Cir. 2002), that cannot be the case when liability for breaching a duty based on an internal rule violation is preempted. Indeed, it would be eminently unfair and ultimately nonsensical to disallow a preempted state common-law claim but then to allow those same preempted duties to provide some evidence upon which a jury could find negligence. And semantics—distinguishing the "basis for" a claim from "evidence of" it—do not alter that conclusion.

Therefore, the question under the *Zimmerman* analysis remains whether Rhinehart's claim, including the alleged breach of CSX's own internal rules, is fair game or preempted by federal law.

b.   *Preemption*

As noted above, internal rules are not preempted when they are adopted pursuant to—i.e., required by—federal law. Here, Rhinehart cites 49 C.F.R. Sections 217 and 218 as regulations that require the internal rules at issue. But those regulations did not require CSX to adopt any specific internal rules. Section 217 requires railroads generally to establish operating rules, instruct its employees on those rules, and file the rules with the Federal Railway Administration. Section 218 establishes minimum requirements for a variety of topics, including the protection of workers; the protection of trains and locomotives; the prohibition against tampering with safety devices; the protection of occupied camp cars; and the handling of equipment, switches, and fixed derails. Section 218 "does not indicate, however, any attempt to

regulate or promulgate standards for the manner in which locomotives are operated while in service," nor does it establish minimum standards for the specific negligent acts Rhinehart alleges. *See Dowe v. AMTRAK*, 2004 WL 887410 (N.D. Ill. Apr. 26, 2004).

Despite the breadth of Sections 217 and 218—in fact, because those sections are so broad—they do not *require* the adoption of the particular internal rules at issue here. Just because a federal regulation requires a railroad, in general terms, to establish operating rules, does not mean that those operating rules are adopted "pursuant to" federal mandate. Indeed, accepting Rhinehart's argument would lead to the circular conclusion that liability for a railroad's failure to follow its own internal rules could never be preempted because all rules would be adopted pursuant to the general mandate in Section 217 to establish operating rules.

As it does with respect to the duty to discourage expected trespassers, CSX argues that any purported duties arising from its internal rules and regulations to sound a train's horn and uncouple stopped cars are impliedly preempted by Congress. Docket Item 106 at 18; Docket Item 113 at 2. Unlike the duty to discourage expected trespassers, however, the duties arising from these internal rules and regulations are preempted by the FRSA.

The FRSA and its resulting regulations demonstrate that Congress intended federal law to exclusively occupy the field of train movement through crossings and specifically sounding train horns. Congress directed the Secretary of Transportation to issue regulations requiring trains to sound the locomotive horn when approaching a "public highway-rail grade crossing" and authorized the adoption of similar regulations for other types of crossings, including "[p]edestrian crossings." 49 U.S.C. § 20153(b),

26

(f)(2).[8]  So trains are required to sound their horns only when crossing public highways and not at other times.  Unlike warning signs, which are discussed tangentially, Section 222 expressly concerns the use of locomotive horns and therefore covers and substantially subsumes state law regulating when train horns must be sounded.  *See* 49 C.F.R. § 222 *et seq.*  Therefore, if a railroad's failure to comply with its internal regulations by sounding a train's horn when the train starts to move could be used as some evidence of common-law negligence, that would undermine the FRSA's goal for "[l]aws, regulations, and orders related to railroad safety [to] be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1).  Because CSX had no duty, under federal law, to sound its train's horn at unauthorized crossings or before moving, and because any state law duty is preempted, there is no material issue of fact with respect to whether or not the engineer did or did not sound the horn before resuming movement on the date of the incident.

Rhinehart's claim that CSX failed to exercise "reasonable care" when it violated its own internal uncoupling and standing rules likewise is preempted by the FRSA.  Such regulations address "the movement of trains through crossings," *Driesen v. Iowa, Chi. & E. R.R. Corp.*, 777 F. Supp. 2d at 1151, a field preempted by such federal regulations as those governing maximum train speed at crossings (i.e., 49 C.F.R. §§ 213.9, 213.307, 213.57) and the testing of air brakes (i.e., 49 C.F.R. §§ 232.201-.219).  Those "regulations . . . substantially subsume, or cover, the subject matter of the movement of trains through crossings."  *Driesen*, 777 F. Supp. 2d at 1151; *see also,*

_____

[8] The Secretary, in turn, delegated this authority to the FRA, which then "exercised its jurisdiction . . . over . . . pedestrian grade crossings."  Use of Locomotive Horns at Highway-Rail Grade Crossings, 71 Fed. Reg. 47,614, 47,615 (Aug. 17, 2006).

*e.g.*, *CSX Transp., Inc.* v. *City of Plymouth*, 92 F. Supp. 2d 643, 658 (E.D. Mich. 2000), *aff'd*, 283 F.3d 812 (6th Cir. 2002). As a result, Rhinehart may not use the purported violation of these internal rules as evidence of his common-law claim.

To summarize, Rhinehart's claim of negligence under the common law is not preempted as to CSX's duty to deter expected trespassers from using the cut-through. On the other hand, because CSX's internal operating rules were not created pursuant to federal regulation,[9] and because federal regulations preempt common-law liability for CSX's alleged violation of those internal rules, there are no material issues of fact that would preclude summary judgment with respect to a duty to sound a train's horn or to uncouple cars when a train is stopped. *See* 49 U.S.C. § 20106(a).

### E. Proximate Cause

Evidence of negligence alone is not enough to establish liability. *Sheehan v. City of New York*, 40 N.Y.2d 496, 501, 354 N.E.2d 832, 834 (1976). "It must also be proved that the negligence was the cause of the event which produced the harm sustained by one who brings the complaint." *Id.* "Under New York law, a plaintiff alleging negligence must prove that the defendant's breach of duty was a cause of the plaintiff's injury,"

---

[9] Nor were the conditions so unique as to constitute a local safety hazard—the other "savings" clause under which a claim can survive preemption by the FRSA. *See* 49 U.S.C. § 20106(a)(2)(A) ("A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation or order . . . is necessary to eliminate or reduce an essentially local safety or security hazard."); *Easterwood*, 507 U.S. at 664, 668 (referring to the predecessor to § 20106, 45 U.S.C. § 434, *repealed* Pub. L. 103-272, § 7(b), July 5, 1994, 108 Stat. 1379, as "contain[ing] express saving and pre-emption clauses"). Rhinehart does not make this argument in his submissions, and this Court therefore does not further address it.

generally by showing cause in fact, a causal link, and proximate cause. *McCarthy v. Olin Corp.*, 119 F.3d 148, 164 (2d Cir. 1997) (citation omitted).

CSX argues that there are no issues of material fact as to proximate cause here. More specifically, CSX maintains that even if it owed a duty to Rhinehart, it nonetheless is entitled to summary judgment because (1) Rhinehart's injury was not caused by any breach of duty or (2) Rhinehart's conduct was a superseding cause that broke any causal connection between CSX's alleged negligence and his injury. Docket Item 106 at 38, 41.

"[W]hen the facts are clearly settled and but one inference is possible to be drawn therefrom," the court can decide the issue of proximate cause as a matter of law. *Donegan v. Baltimore & N.Y. Ry. Co.*, 165 F. 869, 871 (2d Cir. 1908). But because the issue of proximate cause "cannot ordinarily be determined as a matter of law[,] . . . [i]t is generally the province of the jury to determine the proximate cause of an injury." *Id.* This case falls into the latter category.

A jury must decide whether Rhinehart would have undertaken the same course of conduct—i.e., climbing the train—if warnings had told him not to or if a fence or some other barrier had made doing so more difficult. During his deposition, Rhinehart admitted that he had taken the shortcut several times before his accident, even at night, Docket Item 92-2 at 38-39, 59; but he also said that he had seen others take it and that he did not know whether or not they had permission to cross the tracks, *id.* at 39, 75. He admitted that he knew about the swing gate demarcating the property, *id.* at 48; but he also said that he was unfamiliar with using that type of barrier to guard property and that the gate was open on the date of the accident, *id.* at 50-51, 56-57. He admitted

that he waited a couple minutes before climbing the train that night, *id.* at 61; but he also said that he had not previously seen a stopped train start to move at that location, *id.* at 65. Finally, Rhinehart said that he saw the stairs on the train as an invitation: the stairs meant "that people wouldn't get hurt" climbing them; in fact, Rhinehart said that if the stairs weren't meant to be traversed, CSX "would put the bars across [them] because they don't want people walking on the stairs and getting hurt." *Id.* at 74-75.

In light of that testimony, a reasonable jury might find that CSX's alleged breach of its duty of reasonable care proximately caused and at least contributed to Rhinehart's injuries.

Additionally, Rhinehart did not act so recklessly that his conduct supersedes and therefore eliminates CSX's liability. Where "the sole legal cause of plaintiff's injuries is his own reckless conduct, which showed a disregard for an obvious hazard, a defendant is not liable in negligence." *Brown v. Metro. Transit Auth.*, 281 A.D.2d 159, 160, 721 N.Y.S.2d 56, 56 (1st Dep't 2001) (citation omitted). Again, Rhinehart's deposition is instructive. His responses suggest that he did not appreciate and ignore a known danger, but that he reasonably may not have recognized the dangers posed by standing railroad cars that might move. The many cases defendant cites where a plaintiff's reckless conduct broke the causal chain are therefore distinguishable. *See* Docket Item 106 at 38-40 (citing, *inter alia*, *M.B. v. CSX Transp., Inc.*, 130 F. Supp. 3d 654 (N.D.N.Y. 2015) (trying to beat a train, plaintiff ran across tracks); *Lasalle* v. *New York City Transit Auth.*, 11 A.D.3d 661 (2d Dep't 2004) (intoxicated plaintiff sitting on tracks)). So CSX's "superseding cause" theory fails as well.

Because "the question of comparative liability is a factual matter to be resolved by the fact-finder, not a matter of law to be resolved on summary judgment," *Yoos v. Better Life Tech., LLC*, 2012 WL 177867, at *5 (N.D.N.Y. Jan. 23, 2012) (citation omitted), the issues of proximate cause and comparative negligence do not warrant summary judgment here.

## II. Striking the Report of the Plaintiff's Expert Witness

CSX asked the court to disregard the report of Rhinehart's expert. Judge Foschio treated that request as a motion to strike the report pursuant to Rule 702 of the Federal Rules of Evidence. This Court agrees both with Judge Foschio's treatment of the request as a motion to strike and with his resolution of that motion. *See Eng'd Arresting Sys. Corp. v. M/V Saudi Hofuf*, 46 F. Supp. 3d 302, 308 (S.D.N.Y. 2014) ("[T]he Court has an independent responsibility to serve as the gatekeeper for expert testimony and to rely only on competent, admissible evidence in ruling on a motion for summary judgment.") (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)).

Pursuant to 28 U.S.C. § 636(b)(1), and for the reasons explained in Judge Foschio's careful and detailed Report and Recommendation, the defendant's motion to strike the plaintiff's expert's report, Docket Item 92-17, is granted in part and denied in part. Specifically, the Court affirms Judge Foschio's decision to strike items 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16,[10] 17, 18, 19, 20, 21, 22, 23, 24, 25,[11] and 26.[12]

---

[10] Item 16 is stricken as to the location of the stopped train, but it is allowed as to the characterization of the cut-through as a public crossing.

[11] Item 25 is stricken as to whether CSX followed its internal rules, but it is allowed as to whether the train was stopped for more than a reasonable time.

[12] Item 26 is stricken except for reference to the cut-through as a public crossing.

## CONCLUSION

For the reasons stated above and in the Report and Recommendation, this Court DENIES IN PART and GRANTS IN PART the defendant's motion for summary judgment, and DENIES IN PART and GRANTS IN PART the defendant's motion to strike the plaintiff's expert report.

SO ORDERED.

Dated:     August 16, 2017
           Buffalo, New York


                              _s/Lawrence J. Vilardo_
                              LAWRENCE J. VILARDO
                              UNITED STATES DISTRICT JUDGE